United States Court of Appeals,

Eleventh Circuit

No. 95-9558.

UNITED STATES of America, Plaintiff-Appellee,

v.

Nicholas JACKSON, Defendant-Appellant.

June 20, 1997.

Appeal from the United States District Court for the Middle District of Georgia. (No. 7:95-CR-5-1-WDO), Wilbur D. Owens, Jr., Judge.

Before HATCHETT, Chief Judge, BIRCH, Circuit Judge, and CLARK, Senior Circuit Judge.

CLARK, Senior Circuit Judge:

Defendant-appellant Nicholas Jackson pled guilty to one count of traveling interstate in aid of racketeering, *i.e.,* the distribution of cocaine, in violation of 21 U.S.C. § 952. The district court sentenced Jackson to 46 months' imprisonment. Jackson appeals, arguing that the district court erred in using the weight of the entire contents of the package, containing 99 percent sugar and 1 percent cocaine, to calculate the base offense level under the sentencing guidelines.

I. BACKGROUND

Jackson was the passenger in a car stopped by Lowndes County, Georgia, Deputy Sheriff Bryan Fleming for an improper tag. During the traffic stop, the deputy obtained the driver's permission to search the vehicle. Before searching the vehicle, the deputy performed a weapons "pat down" of Jackson, and detected a firm, square item concealed in his clothing.[1] At this point, Jackson broke away from the deputy and ran into the nearby woods. After a short chase, Jackson was taken into custody. A package containing powder cocaine was found about four feet from where he was apprehended. Fleming shoved a pocketknife into the package, and it came out with a white powder. Although the package weighed 1014.4 grams, an ultraviolet spectroscopy showed that approximately

_____

[1]The deputy also detected a package of rolling papers and Jackson admitted that he had a small bag of marijuana in his clothes bag.

10 grams, or about 1 percent, were cocaine.[2]

Jackson was indicted on two counts of possessing with intent to distribute cocaine (Count One), and traveling in interstate commerce with the intent to promote, carry on, and facilitate the transportation and concealment of cocaine (Count Two). He pled guilty to Count Two, and Count One was dismissed.

The probation officer submitted a presentence report calculating the guidelines' range. The base offense level was calculated by considering the relevant conduct,[3] finding the marijuana equivalency,[4] and adding the quantities of drugs.[5] Under the equivalency tables, the quantity of drugs was 202,881.1 kilograms of marijuana.[6] The Drug Quantity Table provides for a base offense level of 26 for this amount of marijuana or its equivalent.[7] Adjustments to this offense level netted three and, accordingly, the probation officer found the guideline range to be 46 to 57 months. Jackson objected, arguing that the appropriate quantity of cocaine should be only the ten grams of cocaine that was located on the sugar.

At the sentencing hearing, Georgia Bureau of Investigation chemist Larry Wheeler testified that the contents of the package "appeared to be uniform throughout" but that "some of it was in

---

[2]A small bag of marijuana was subsequently located in a blue bag located in the back seat of the car. The net weight of the marijuana was established as 1.1 grams.

[3]U.S.S.G. § 1B1.3(a).

[4]U.S.S.G. § 2D1.1, Drug Equivalency Tables. The tables mandate that each of the drugs be converted to its marijuana equivalent. U.S.S.G. § 2D1.1, comment (n. 10).

[5]U.S.S.G. § 2E1.2(a) [which directs that the base offense level shall be the greater of (1) base offense level 6, or (2) the underlying unlawful activity in respect to which the travel was undertaken]. The underlying offense is the distribution of cocaine in violation of 21 U.S.C. § 841(a)(1). The base offense level is then found at U.S.S.G. § 2D1.1, comment. (n. 6) [which directs that when there are multiple drug types, the quantities of the drugs be added]. The base offense level is calculated by including all the drugs, not just those included in the counts of conviction. *See* § 1B1.3(a)(2), comment (background) and § 3D1.2(d).

[6]U.S.S.G. § 2D1.1, Drug Equivalency Tables. [One gram of cocaine equals 200 grams of marijuana]. The probation officer used the weight of the cocaine mixture, 1,014.4 grams, and added the 1.1 grams of marijuana.

[7]U.S.S.G. § 2D1.1.

lumps, some of it was in powder."[8]  He said that tests on the powder were positive for cocaine, but tests on several lumps were negative for cocaine.  Wheeler read a letter that he had written in response to questions from the U.S. Attorney, saying that during the testing he:

> made no attempt to weigh the lumps or the powder separately.  At this time it would be impossible for me to determine the extent of mixing that occurred during my analysis and subsequent repackaging and storing of the evidence....
>
> My own intuition about this case is that most likely this block of powder was prepared to be sold as "rip-off" and that the cocaine present was originally contained in an area at the surface of the block.  This, so that an authentic sample could be given if requested.  There would be no reason that I know of, to mix the amount of cocaine present in this case with this large a quantity of powder (sugar).[9]

Wheeler explained that sugar would be consumed when used as a cutting agent and sold as cocaine.  On cross-examination Wheeler said that "(t)his is not 1000 grams of cocaine."  He explained that "(t)his 10 grams was not uniformly mixed throughout the powder and the lumps because some of the lumps had no cocaine in them....  It didn't start out being at the time that I first analyzed it, being 1014 grams with an equal mixture of 1% cocaine throughout...."[10]  He also said that "(t)hose lumps were not a mixture of cocaine and anything else...."[11]  He said that he did not think that a mixture of 10 grams of cocaine and 1004 grams of sugar would have been marketable or detectable to a field test for cocaine.

James W. Swift, a City of Macon Police Department officer assigned to the Drug Enforcement Administration Task Force, described the package as "... one kilo rip-off of cocaine ... (and) (i)f you paid more than $100, you didn't get your money's worth."[12]  He said that, usually, when cocaine is packaged "... to be rip-off, it's not going to be just laced on top, it's going to be mixed through."[13]

---

[8]R2 at 4.

[9]R1-22, govt. exh. 3 at 1;  R2 at 8.

[10]R2 at 10, 12.

[11]R2 at 14.

[12]R2 at 32.

[13]R2 at 27, 30.

The district court found "by a preponderance of the evidence that more than 500 grams of the mixture was cocaine and sugar and contained a detectable amount of cocaine" and that Presentence Report properly computed the guideline range.

## II. DISCUSSION

Jackson argues that the district court erred in using the weight of the entire package containing the cocaine because, since it contained only 1 percent cocaine, there was no "mixture." He also argues that, even if there was a mixture, it did not fit into the definition of a "mixture" under the Guidelines because the dilution of 10 grams of cocaine and 1000 grams of sugar would constitute an unusable drug. The government responds that the entire content weight applies because the package contained a detectable amount of cocaine.

A district court's determination of the drug quantity used to establish a base offense level is reviewed for clear error.[14] Jackson's sentence was based on 21 U.S.C. § 841(b)(1)(B)(ii), which applies to "500 grams or more of a mixture or substance containing a detectable amount of" cocaine. The United States Sentencing Guidelines provide that, unless otherwise specified, the weight of a controlled substance, as set forth in the Drug Quantity Table, refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance.[15] Because marijuana and cocaine are not otherwise specified, the relevant weight is the entire weight of any mixture or substance containing a detectable amount of marijuana (or its equivalent).

In *Chapman v. United States,*[16] the Supreme Court held that, "[s]o long as [the mixture] contains a detectable amount [of a controlled substance], the entire mixture or substance is to be weighed when calculating the sentence."[17] Noting that "[n]either the statute nor the Sentencing Guidelines define the terms "mixture' and "substance,' nor do they have an established common-law

---

[14]*United States v. Smith,* 51 F.3d 980, 981 (11th Cir.1995) [citing *United States v. Carroll,* 6 F.3d 735, 742 (11th Cir.1993), *cert. denied,* 510 U.S. 1183, 114 S.Ct. 1234, 127 L.Ed.2d 577 (1994) ].

[15]U.S.S.G. § 2D1.1(c), (n*) (Drug Quantity Table).

[16]500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991).

[17]*Id.* at 459, 111 S.Ct. at 1924.

meaning," the Supreme Court gave the terms their ordinary meaning.[18]   Therefore, the Supreme

Court defined a "mixture" as " "a portion of matter consisting of two or more components that do

not bear a fixed proportion to one another and that however thoroughly commingled are regarded

as retaining a separate existence' "[19] or "two substances blended together so that the particles of one

are diffused among the particles of the other."[20]   The Supreme Court based its reasoning on

Congress's intent to punish "the total quantity of what is distributed, rather than the amount of pure

drug involved[.]"[21]  The Court observed that, in using the words "mixture or substance," Congress

"intended the penalties for drug trafficking to be graduated according to the weight of the drugs in

whatever form they were found—cut or uncut, pure or impure, ready for wholesale or ready for

distribution at the retail level."[22]

Effective November 1, 1993[23], the United States Sentencing Commission amended the

guidelines to provide a "[m]ixture or substance does not include materials that must be separated

from the controlled substance before the controlled substance can be used," such as "fiberglass in

a cocaine/fiberglass bonded suitcase, beeswax in a cocaine/beeswax statute, and waste water from

an illicit laboratory used to manufacture a controlled substance."  If such material cannot be readily

separated from the mixture or substance that appropriately is counted in the Drug Quantity Table,

the court may use any reasonable method to approximate the weight of the mixture or substance to

be counted.[24]   In promulgating the amendment, the Sentencing Commission addressed the

---

[18]*Id.* at 462, 111 S.Ct. at 1925-1926 [citing *Moskal v. United States,* 498 U.S. 103, 108, 111 S.Ct. 461, 465, 112 L.Ed.2d 449 (1990) ].

[19]*Id.* at 462, 111 S.Ct. at 1926 [quoting Webster's Third New International Dictionary 1449 (1986) ].

[20]*Id.* at 462, 111 S.Ct. at 1926 [citing 9 Oxford English Dictionary 921 (2d ed.1989)].

[21]*Id.* at 455, 111 S.Ct. at 1922.

[22]*Id.* at 461, 111 S.Ct. at 1925.

[23]Jackson was sentenced on December 4, 1995.  The sentencing court must use the guidelines in effect at the time of sentencing.  *United States v. Camacho,* 40 F.3d 349, 354 (11th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 1810, 131 L.Ed.2d 735 (1995).

[24]U.S.S.G. § 2D1., comment. (n. 1) (Nov. 1995).

"inter-circuit conflict regarding the meaning of the term "mixture or substance' as used in § 2D1.1 by expressly providing that this term does not include portions of a drug mixture that have to be separated from the controlled substance before the controlled substance can be used."[25] The Commission noted that, subsequent to *Chapman,* the issue had arisen in two types of cases: (1) where a controlled substance is bonded to, or suspended in, another substance, and the controlled substance is not usable until it is separated from the other substance; and (2) where the waste from the manufacture of a controlled substance is confiscated before the chemical processing of the controlled substance is completed, and no weight is provided for the controlled substance in the waste because it is too small to quantify.[26] Other than the "exclusion of materials which must be separated from the controlled substance before the controlled substance can be used," it appears that the "entire weight rule of *Chapman*" must be followed.[27]

In *United States v. Rolande-Gabriel,*[28] this court adopted a "marketable" approach about whether a sentencing calculation should be based on the entire mixture of cocaine, a cutting agent, and "liquid waste," or on the mixture of cocaine and the cutting agent that remained after the liquid was removed.[29] In distinguishing *Chapman,* this court noted that "[w]hile the LSD [in *Chapman* was] ready for sale, use, or consumption when it is placed on standard carrier mediums such as blotter paper, ... the cocaine mixture in this case was obviously unusable while mixed with the liquid

---

[25]U.S.S.G. App. C, amend. 484.

[26]*Id.*

[27]*United States v. Pope,* 58 F.3d 1567, 1572 (11th Cir.1995) (holding that "the entire weight rule of Chapman must still be followed for purposes ... of the mandatory, minimum sentence for an LSD conviction despite Guidelines' amendments"), *cert. denied,* --- U.S. ----, 116 S.Ct. 1831, 134 L.Ed.2d 935 (1996).

[28]938 F.2d 1231 (11th Cir.1991).

[29]Although Rolande-Gabriel objected to the inclusion of the weight of the "liquid carrier" in the determination of her base offense level, it does not appear that she objected to the inclusion of the weight of the cutting agent. The entire mixture weighed 241.6 grams; the powder extracted from the liquid weighed 72.2 grams and consisted of 7.2 grams of cocaine base and 65 grams of a cutting agent. *Id.* at 1232, 1236.

waste material."[30]  This court held that "[t]he entire weight of drug mixtures which are usable in the chain of distribution should be considered in determining a defendant's sentence."[31]

The marketable or "usable" approach has been adopted by the Second[32], Third[33], Fifth[34],

---

[30]*Id.* at 1237.

[31]*Id.* at 1238.  In conclusion, this court stated that Rolande-Gabriel "should have been sentenced based on the 72.2 grams of usable powder consisting of cutting agent and cocaine base."  *Also see United States v. Bristol,* 964 F.2d 1088, 1089-1090 (11th Cir.1992) (the weight of wine used as a medium to transport cocaine should not have been included in the determination of base offense level);  *United States v. Newsome,* 998 F.2d 1571, 1578 (11th Cir.1993) (discarded "sludge" from methamphetamine production, which would "never find [its] way to ... consumers," should not have been included in calculation), *cert. denied,* 510 U.S. 1062, 114 S.Ct. 737, 126 L.Ed.2d 700 (1994).

[32]*United States v. Acosta,* 963 F.2d 551 (2nd Cir.1992) (holding that the weight of creme liqueur in which the cocaine was dissolved for transport should not be included in the sentencing calculation as it was an unusable portion of the mixture, making the drugs uningestible and unmarketable).

[33]*United States v. Rodriguez,* 975 F.2d 999, 1007, *reh'g denied* (3rd Cir.1992).

[34]*United States v. Palacios-Molina,* 7 F.3d 49, 53-54 (5th Cir.1993) (the liquid in which cocaine was mixed should have been excluded because it was not part of the marketable mixture and was the functional equivalent of packaging material;  the cocaine was not marketable until it was distilled).

Sixth[35], Seventh[36] and Ninth[37] Circuits[38], and rejected by the First[39] and Tenth[40] Circuits.

Two of the circuits have addressed facts similar to that presented here. In *United States v. Rodriguez,* the packages contained 97% boric acid and 3% cocaine.[41] The packages were constructed with a base of boric acid, covered on top by a piece of yellow tape, with a thin layer of cocaine spread on the surface of the tape.[42] Each package had cocaine placed into a triangular hole or window dug into the boric acid just below the tape, and was wrapped in plastic and brown paper.[43] The Third Circuit held that the boric acid and cocaine were not a mixture because (1) the cocaine was not mixed among the particles of the boric acid; (2) the cocaine was set on top of the

[35]*United States v. Jennings,* 945 F.2d 129 (6th Cir.1991) (remanding a sentencing calculation for further consideration, finding that it would inappropriate to include the weight of the entire mixture in container used in the distillation of methamphetamine, which included methamphetamine, and poisonous unreacted chemicals and by-products, and holding that the district court would be limited to the amount of methamphetamine the defendants were capable of producing).

[36]*United States v. Johnson,* 999 F.2d 1192, 1196-1197 (7th Cir.1993) (the weight of the liquid containing a trace amount of cocaine should be excluded as it (1) did not serve as a dilutant, cutting agent or carrier medium, or facilitate the distribution, and (2) was not a useable, ingestible or marketable mixture).

[37]*United States v. Robins,* 967 F.2d 1387, 1389 (9th Cir.1992).

[38]Although the Fifth and the Ninth Circuits had rejected the "marketable" approach as to waste water in methamphetamine cases, *United States v. Sherrod,* 964 F.2d 1501, 1509, 1510 (5th Cir.1992), *cert. denied,* 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993), and *United States v. Beltran-Felix,* 934 F.2d 1075, 1076 (9th Cir.1991), *cert. denied,* 502 U.S. 1065, 112 S.Ct. 955, 117, 117 L.Ed.2d 123 Ed.2d 123 (1992), those opinions pre-date the Guidelines' amendment excluding waste water.

[39]*United States v. Campbell,* 61 F.3d 976, 983-984 (1st Cir.1995) (finding that the weight of the entire mixture containing the controlled substance should be included in the sentencing calculation where the surplus materials did not need to be separated from the controlled substance before the controlled substance was usable), *cert. denied,* --- U.S. ----, 116 S.Ct. 1556, 134 L.Ed.2d 657 (1996).

[40]*United States v. Richards,* 87 F.3d 1152, 1157 (10th Cir.) (*en banc*) (holding that "the plain meaning of § 841(b), and Supreme Court precedent" require that the weight of the entire mixture of liquid by-products and methamphetamine be used to calculate the defendant's sentence), *cert. dismissed,* --- U.S. ----, 117 S.Ct. 540, 136 L.Ed.2d 396 (1996).

[41]*Rodriguez,* 975 F.2d at 1001.

[42]*Id.*

[43]*Id.*

boric acid; (3) the cocaine and boric acid could be distinguished visually by their different colors; (4) the cocaine was easily separated from the boric acid; (5) the boric acid was not used or intended to be used as a cutting agent; and (6) the boric acid did not facilitate the distribution of the cocaine.[44] The court noted that "it does not seem possible that the ... boric acid, which comprised over 97 percent of the weight of the contents of the package could have been used to cut the ... cocaine without rendering the resulting mixture unmarketable."[45] The court held that the defendants should be sentenced based on the weight of the usable cocaine, and not on the weight of the boric acid.[46]

In *United States v. Robins,* the packages contained 2,779 grams of cornmeal and one-tenth gram of cocaine.[47] The packages were constructed by wrapping the plastic bags of cornmeal in duct tape, with a V-shaped cut into the tape and filled with cocaine.[48] The district court had found "that the cocaine was "stirred' into the cornmeal' in the V-shaped cutmark areas of the packages.[49] " The Ninth Circuit held that the cornmeal and cocaine were not a mixture because (1) they were each easily distinguished; (2) cornmeal is not a "tool of the trade," a carrier medium or a cutting agent, and did not facilitate the distribution of cocaine; (3) they had to be separated before the cocaine could be effectively used; and (4) although the cornmeal was "consumable," it was not used as a cutting agent to increase the amount of drug available to consumers.[50] The court noted that "the cornmeal was not used to distribut[e] ... the cocaine," but was used to "trick a purchaser into buying cornmeal thinking it was cocaine."[51] The court held that the weight of the cornmeal should not have

---

[44]*Id.* at 1005.

[45]*Id.*

[46]*Id.* at 1007.

[47]*Robins,* 967 F.2d at 1388.

[48]*Id.*

[49]*Id.* at 1389.

[50]*Id.* at 1389-1390.

[51]*Id.* at 1391.

been included in calculating the sentence.[52]

Here, the package contained 1104.4 grams of sugar, and 10 grams of cocaine. The chemist testified that the package was probably constructed so that "the cocaine present was originally contained in an area at the surface of the block." Although tests for cocaine on the powder in the package were positive, tests on several lumps of the sugar were negative. The chemist said that it would be impossible to determine the extent of the mixing that occurred during the analysis and repackaging. There was testimony from the chemist and the police officer that the cocaine, as packaged, was not marketable, was not worth more than $100, and probably would not have been detectable if mixed with the sugar. Although the cocaine and sugar are not easily distinguished, sugar is commonly used as a cutting agent, and the sugar was "consumable." The sugar was not used as a cutting agent but was used to trick a purchaser into thinking it was cocaine. And, consistent with the Third Circuit's analysis in *Rodriguez,* it does not seem possible that the sugar, which comprised over 99 percent of the weight of contents of the package could have been used to cut the cocaine without rendering the resulting mixture unmarketable.

## III. CONCLUSION

The evidence establishes that the contents of the package was not a mixture.[53] Jackson should have been sentenced based on the ten grams of cocaine. We, therefore, hold that the district court erred in basing Jackson's sentence upon the weight of the entire unmarketable package. Jackson's sentence is VACATED and this cause is REMANDED for resentencing.

---

[52]*Id.*

[53]The portion that was a "mixture" may have resulted from cocaine that was mixed into the sugar by the arresting officer's knife, or during the chemist's analysis and repackaging. As the cocaine and sugar were weighed separately, it does not appear that an approximation of the weight of the mixture or cocaine under § 2D1, comment. (n. 1) is necessary.