[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 12, 2006
THOMAS K. KAHN
CLERK

No. 05-12705

_____

D. C. Docket No. 04-00235-CR-JOF-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROBERTO SEGURA-BALTAZAR,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(May 12, 2006)**

Before DUBINA, MARCUS, and PRYOR, Circuit Judges.

MARCUS, Circuit Judge:

Roberto Segura-Baltazar ("Segura-Baltazar") appeals his conviction and

ensuing sentence for possession with intent to distribute cocaine and

methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), and (b)(1)(C), and for possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). Segura-Baltazar was convicted on all counts after a bench trial and was sentenced to concurrent 120-month terms for the drug counts and a consecutive 60-month term for the gun charge. On appeal, the defendant argues that the district court erred in failing to suppress certain evidence seized from his home and in finding evidence of at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine, which is the threshold amount necessary for the mandatory minimum 10-year sentence he received. After thorough review, we affirm.

## I.

The essential facts are these. In the course of a drug investigation involving a suspect known only as "Alejandro," police identified numerous incoming calls from a phone number registered to Bernabe Perez, an alias of the defendant, at 480 Sheringham Court in Roswell, Georgia. Based on that information, police began surveillance at 480 Sheringham Court. Officer Ronald Gooden of the City of Roswell Police Department determined that it would be helpful to inspect the trash discarded from the house at 480 Sheringham Court, and he contacted the Roswell sanitation department for assistance.

2

Gooden learned that trash was normally collected from the suspect's home on Wednesdays. Accordingly, he met with Jerry Kimbral, the sanitation truck driver for that route, on Wednesday, January 14, 2004, the normal collection day. Officer Gooden and Kimbral drove to 480 Sheringham Court in an empty garbage truck. They found garbage left for collection in front of the house to the left of a mailbox, in an area that was not enclosed by a fence and that was approximately fifty-five to sixty-five feet from the residence and three to six feet from the curb. The garbage was contained in bags which, in turn, were found inside large garbage cans that were covered with lids. Kimbral emptied the bags into the garbage truck and drove to the Roswell police department, where Officer Gooden retrieved the trash and processed it for evidence. The same procedure was repeated on other normal collection Wednesdays -- January 21, 2004, February 4, 18, and 25, 2004, and March 3 and 10, 2004.

On two other occasions, the trash-pull procedures were slightly different. The magistrate judge described the events of January 28, 2004, in these terms:

> Gooden was with Kimbral and another sanitation department employee, Luiz Gordado, whom Gooden understood spoke Spanish. On that morning, part of the garbage was located in the garbage cans at the curb. Gooden also observed garbage cans, containing what appeared to be bags of garbage, sitting to the left side of the residence near the garage. <u>Kimbral informed Gooden that it was customary for him to collect the garbage from the location next to the garage when it was left there and not at the curb</u>. He asked if Gooden wanted him to

3

> collect that garbage. Gooden instructed Kimbral and Gordado to verify with the resident that the garbage was to be collected. Kimbral and Gordado walked up and knocked on the door of the residence. After conferring with a female at the door, they collected the garbage located next to the garage. That garbage, along with the garbage located next to the curb, was placed in the truck, and Gooden retrieved the garbage at the police department where he examined it for evidence.

(citations and footnotes omitted) (emphasis added). Similarly, on Wednesday February 11, 2004, Gooden and Kimbral retrieved trash from cans that were sitting to the left of the residence near the garage. They followed the same procedures they employed on January 28; the only difference was that there was no trash at the curb on February 11.

The police recovered many inculpatory items from the trash pulls indicating that the residents of 480 Sheringham Court were involved in illegal drug activity. Specifically, they found 42 grams of methamphetamine; 41 grams of marijuana; plastic wrappings that field-tested positive for cocaine; and numerous bags containing residue that field-tested positive for cocaine, marijuana, and methamphetamine. Additionally, the police found papers depicting names with numerical amounts listed next to each name (which they believed were drug ledgers); financial documents indicating the presence of large amounts of currency, including evidence of wire transfers exceeding $10,000; and boxes that had contained wireless surveillance cameras and monitors that would enable a user to

4

see in low light conditions. Officer Gooden testified that, based on his experience, devices such as these are often used by drug dealers as countersurveillance tools. Finally, the police recovered two types of magazines for semiautomatic handguns, an empty box of 12-gauge shotgun shells, and one live round of .45-caliber ammunition.

Based on the evidence obtained through the trash pulls and information provided by a confidential informant, Gooden obtained a federal search warrant for the house located at 480 Sheringham Court. Because of the "exigent circumstances of potential bodily injury to law enforcement officers," the warrant was issued by the magistrate with a "no-knock" provision. The search warrant was executed on March 25, 2004, and the officers entered the residence without knocking or announcing their presence. During the ensuing search police recovered approximately 1200 grams of methamphetamine, 130 grams of cocaine, two semiautomatic handguns, two .22-caliber rifles, one shotgun, $19,631 in U.S. currency, and numerous forms of identification bearing several different names matched with the defendant's picture.

On appeal, Segura-Baltazar argues that the district court fatally erred by (1) refusing to suppress the evidence recovered from the trash pulls, (2) upholding the validity of the search warrant with a "no-knock" provision, and (3) using the total

5

weight of the methamphetamine mixture to calculate the base offense level for sentencing purposes. We consider each argument in turn.

**II.**

In reviewing an order denying a motion to suppress, we review findings of fact for clear error and the application of the law to those facts de novo. United States v. Muegge, 225 F.3d 1267, 1269 (11th Cir. 2000) (per curiam). To prevail on a Fourth Amendment claim, a defendant must show two things:

> First, there must be a search and seizure of that individual's person, house, papers or effects, conducted by an agent of the government; stated differently, there must be an invasion of the claimant's reasonable expectation of privacy. Second, the challenged search and seizure must be "unreasonable," as not all searches and seizures are proscribed by the fourth amendment, but only those that are "unreasonable."

United States v. Bachner, 706 F.2d 1121, 1125 (11th Cir. 1983) (citations omitted). The party alleging an unconstitutional search must establish both a subjective and an objective expectation of privacy. United States v. Robinson, 62 F.3d 1325, 1328 (11th Cir. 1995). "The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable." Id. (internal quotation marks and brackets omitted); see also California v. Greenwood, 486 U.S. 35, 39 (1988) ("The warrantless search and seizure of the garbage bags

6

left at the curb outside the Greenwood house would violate the Fourth Amendment only if respondents manifested a subjective expectation of privacy in their garbage that society accepts as objectively reasonable.").

The Supreme Court has addressed a case raising similar Fourth Amendment issues and with similar facts in Greenwood. There, the police received information that a suspect might be involved with drug transactions, and they enlisted the help of the local trash collector to retrieve "plastic garbage bags that Greenwood had left on the curb in front of his house." Id. at 37. The evidence found in the defendant's garbage was then used as the basis for obtaining a search warrant for his house, where police found drugs. The Supreme Court held that even if Greenwood had an actual (subjective) expectation of privacy in the contents of the opaque trash bags he left on the street, it was not an expectation society was willing to accept as objectively reasonable:

> Here, we conclude that respondents exposed their garbage to the public sufficiently to defeat their claim to Fourth Amendment protection. It is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public. Moreover, respondents placed their refuse at the curb for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through respondents' trash or permitted others, such as the police, to do so. Accordingly, having deposited their garbage in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it, respondents could have had no reasonable

7

expectation of privacy in the inculpatory items that they discarded.

Id. at 40-41 (citations, internal quotation marks, and footnotes omitted). Thus, the Court held, there was no Fourth Amendment violation, and the evidence recovered from Greenwood's trash could be used to support a search warrant application.

We readily affirm the district court's denial of the motion to suppress the evidence recovered from trash left at the curb in front of Segura-Baltazar's house. Indeed, the facts of this case are strikingly similar to those considered in Greenwood. The only apparent distinctions -- that the garbage in Greenwood was placed on the curb (as opposed to three to six feet from the curb) and was in only an opaque garbage bag (as opposed to a garbage bag that was placed inside a garbage can) -- are insufficient to warrant any different outcome. Having placed the garbage near the curb for the purpose of conveying it to third parties, the trash collector, or other members of the public, we cannot find that appellant had a reasonable expectation of privacy in the inculpatory items discarded.

Whether there was a reasonable expectation of privacy in the trash left at the left side of the residence near the garage is a closer question, the obvious distinction being that trash left near the curb is more exposed to the public than is trash left closer to the house. Segura-Baltazar urges that the trash near the garage was within the curtilage (generally the land or yard adjoining a house) of his home

8

and therefore well within the protections of the Fourth Amendment. The district court never made a specific finding that the trash near the garage was inside or outside the curtilage, and we find it unnecessary to decide that question on appeal. Indeed, Greenwood instructs us to consider the extent to which the garbage was exposed to the public, and that analysis does not require a "curtilage" determination.[1] See Greenwood, 486 U.S. at 40 (concluding that "respondents exposed their garbage to the public sufficiently to defeat their claim to Fourth Amendment protection"); United States v. Hall, 47 F.3d 1091, 1096 (11th Cir. 1995) (noting that Greenwood "demonstrates that one indicator of the objective reasonableness of an expectation of privacy in discarded garbage is the degree to which persons expose their garbage to the public"); see also United States v. Long, 176 F.3d 1304, 1308 (10th Cir. 1999) ("Even if we were to conclude that the trash bags were within the curtilage, Defendant would not prevail. . . . In garbage cases, Fourth Amendment reasonableness turns on public accessibility to the trash."); United States v. Comeaux, 955 F.2d 586, 589 (8th Cir. 1992) ("[E]ven assuming that the garbage cans were within the curtilage, we find [defendant's] claim to be

---

[1]That is not to say it would have been error to decide whether the trash was inside or outside the curtilage. Whether trash is sufficiently exposed to the public to render any expectation of privacy objectively unreasonable is a fact-intensive inquiry, and we would not fault a district court for considering the location of the trash vis-à-vis the curtilage. We simply observe that the curtilage determination has no talismanic significance in concluding whether the government has violated the Fourth Amendment by rummaging through someone's garbage.

9

without merit. We believe that the proper focus under Greenwood is whether the garbage was readily accessible to the public so as to render any expectation of privacy objectively unreasonable." (internal quotation marks omitted)).

The district court here found that the trash was sufficiently exposed to the public to defeat a reasonable expectation of privacy because it was left in a location where the sanitation workers regularly would, on Wednesdays, remove it along with trash left by the street; indeed, nothing was done to prevent the removal of the garbage; and the garbage remained within the public view. We agree.

First, the district court found as a fact that the "customary location" for trash collection was the area by the street. However, after an evidentiary hearing, the magistrate judge explicitly found that it was also "the practice to collect garbage left next to the residence," and that "[i]f Gooden had not been present on those mornings, the garbage next to the residence would have been collected." Thus, the district court found, the trash next to the house was "left for collection" because it was placed in an area where it was customarily collected by sanitation employees and at a time when the garbage collectors made their normal rounds. See Greenwood, 486 U.S. at 41 (finding no reasonable expectation of privacy in trash "left for collection in an area accessible to the public" (emphasis added)). We agree that placing trash in a location where it is routinely removed by trash

10

collectors, on the day designated for trash collection, lessens the reasonableness of a homeowner's expectation of privacy. See, e.g., id. at 40 (considering the fact that the refuse was left "for the express purpose of conveying it to a third party"); Long, 176 F.3d at 1309 (considering the fact that defendant had "purposefully placed the trash bags . . . for collection" in the course of finding no reasonable expectation of privacy); United States v. Redmon, 138 F.3d 1109, 1113 (7th Cir. 1998) (en banc) (noting that the "garbage cans were purposefully placed by [the defendant] outside his garage for collection and could not be considered some sort of personal safety deposit boxes designed for his illegal purposes"); United States v. Hedrick, 922 F.2d 396, 400 (7th Cir. 1991) (affirming denial of motion to suppress in part because the garbage was left in the designated collection location).[2]

Next, the district court found that the garbage closer to the house was plainly visible to the public. The district court concluded that this weighed in favor of denying the motion to suppress. That finding was correct, too. Although a member of the public would have had to access Segura-Baltazar's property to gain

---

[2]In this case, there is evidence that the trash collector confirmed with a woman inside the home that the trash next to the house was ready for collection before removing it from the property. However, the district court did not rely on a consent theory, and the government does not urge us to consider that issue on appeal. Accordingly, we do not rely on the fact that an occupant of the house apparently gave verbal permission for the trash collector to remove the garbage in upholding this search and seizure.

access to the trash, that fact alone does not provide him with a reasonable expectation of privacy. As the Seventh Circuit explained:

> The willingness of members of the public to trespass upon private property in order to search through garbage cans cannot automatically defeat the Fourth Amendment expectation of privacy any more than a series of burglaries could eliminate any expectation of privacy in the home. Where, however, the garbage is readily accessible from the street or other public thoroughfares, an expectation of privacy may be objectively unreasonable because of the common practice of scavengers, snoops, and other members of the public in sorting through garbage. In other words, garbage placed where it is not only accessible to the public but likely to be viewed by the public is "knowingly exposed" to the public for Fourth Amendment purposes.

Hedrick, 922 F.2d at 400. Even though the trash was located on Segura-Baltazar's property, near his garage, there was no reasonable expectation of privacy because the trash was sufficiently exposed to the public.

The district court made no factual finding concerning exactly how far the garbage next to the house was from the public sidewalk or street. However, there was testimony that the trash near the curb was three to six feet from the sidewalk, and fifty-five to sixty-five feet from the house. So, we can assume that the house was no more than sixty or seventy feet from the sidewalk. Regardless of the exact distance, however, the facts we find most relevant and persuasive are that the garbage was plainly visible and accessible from the street. See Redmon, 138 F.3d at 1114 (concluding that there was no reasonable expectation of privacy in garbage

12

left outside a garage, at the head of a driveway, in part because it was "publicly exposed and accessible"); United States v. Shanks, 97 F.3d 977, 980 (7th Cir. 1996) (finding no reasonable expectation of privacy because garbage cans placed next to a garage, and facing an alley, "were readily accessible and visible from a public thoroughfare"); Hedrick, 922 F.2d at 400 (finding no reasonable expectation of privacy in part because "the garbage cans were clearly visible from the sidewalk").

Taken together, the facts of this case lead us to the conclusion that Segura-Baltazar did not have a reasonable expectation of privacy in the trash that he left in the usual course of events for collection outside but near his home. The trash was placed in a location where it was customarily retrieved by sanitation employees, it was left there at the designated time for trash collection, and it was clearly visible and accessible from the street. Unfortunately, we can offer no bright-line rule to fit all future garbage suppression cases. See Redmon, 138 F.3d at 1111 (noting that a "convenient rule to fit all situations" is simply not practical). These inquiries are highly fact-intensive, and we simply find that on the particular facts of this case, Segura-Baltazar had no reasonable expectation of privacy in either the trash near the curb or the trash near his house.[3]

---

[3]Segura-Baltazar also argues that the evidence from the trash pulls failed to provide probable cause for a search of 480 Sheringham Court. We are unpersuaded. As the district court

13

## III.

The police officers used the fruits of the garbage pulls to support their application for a warrant to search 480 Sheringham Court. The warrant was issued by a federal magistrate judge, and the search uncovered significant quantities of illegal drugs. Segura-Baltazar contends that the magistrate judge erred in issuing the warrant with a "no-knock" provision. Specifically, the judge stated in the warrant that "based on exigent circumstances of potential bodily injury to law enforcement officers, I specifically authorize no-knock entry into the residence." The district court found that even if the "no-knock" provision was not supported by reasonable suspicion, the officers had a good faith basis for believing the warrant was valid and therefore refused to suppress the drugs and firearms found in the search. See United States v. Leon, 468 U.S. 897, 922 (1984) (establishing the good faith exception to the exclusionary rule). After thorough review we conclude that the "no-knock" provision was indeed supported by reasonable suspicion and, therefore, we need not consider whether the warrant, if otherwise invalid, would be saved by the good faith exception. Cf. United States v. Jiminez, 224 F.3d 1243,

---

found, the police recovered numerous documents from the trash bearing names of residents who were known to live at 480 Sheringham Court, including financial receipts, medical records, and mail. There was ample evidence in the garbage connecting the trash left in front of 480 Sheringham Court to the occupants of that residence and we reject Segura-Baltazar's argument to the contrary.

1249 n.1 (11th Cir. 2000) (noting that there is no need to consider the good faith exception when there is probable cause to support the warrant).

Again, when reviewing the denial of a motion to suppress, we review findings of fact for clear error and the application of the law to those facts de novo. Muegge, 225 F.3d at 1269. The Fourth Amendment incorporates the important common law requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry. Wilson v. Arkansas, 514 U.S. 927, 934 (1995). However, a "no-knock" entry is permissible under special circumstances. "In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Richards v. Wisconsin, 520 U.S. 385, 394 (1997); see also United States v. Banks, 540 U.S. 31, 36 (2003) (noting that "[w]hen a warrant applicant gives reasonable grounds to expect futility or to suspect that one or another such exigency already exists or will arise instantly upon knocking, a magistrate judge is acting within the Constitution to authorize a 'no-knock' entry"). The showing an officer must make to receive a "no-knock" warrant "is not high." Richards, 520 U.S. at 394. In determining whether reasonable

15

suspicion exists to justify a "no-knock" entry, we consider the totality of the circumstances. Banks, 540 U.S. at 36.[4]

We have not yet had occasion to address the requirements for a "no-knock" entry, but the Supreme Court has done so on several occasions, and our sister circuits have heeded the Court's observation that the officer's burden "is not high." See, e.g., United States v. Stevens, 439 F.3d 983, 988-89 (8th Cir. 2006) (finding a "no-knock" provision justified based on information from a confidential informant that a sawed-off shotgun was kept in a common area of the house to be searched); United States v. Musa, 401 F.3d 1208, 1214 (10th Cir.), cert. denied, 126 S. Ct. 295 (2005) (finding a "no-knock" entry justified when the case involved a search for drugs and where defendant had a violent past that included gun charges and assaults on law enforcement officers); United States v. Wardrick, 350 F.3d 446, 451-52 (4th Cir. 2003) ("no-knock" search warrant justified where subject had a history of violent crime and authorities believed he would be armed and home at

_____

[4]A federal statute also provides that an officer may break open a door or window to execute a search warrant if, "after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant." 18 U.S.C. § 3109. The Supreme Court has held that "§ 3109 includes an exigent circumstances exception and that the exception's applicability in a given instance is measured by the same standard we articulated [under the Fourth Amendment] in Richards." United States v. Ramirez, 523 U.S. 65, 73 (1998). Thus, the federal statute "does not entitle a defendant to greater protections than does the Fourth Amendment." United States v. Scroggins, 361 F.3d 1075, 1080 (8th Cir. 2004). Accordingly, we need only evaluate Segura-Baltazar's claims under the Fourth Amendment. See id.

16

the time of the search).

In this case, the affidavit in support of the search warrant reveals that officers recovered the following items pregnant with the possibility of violence from Segura-Baltazar's trash: labels for two different types of magazines for semiautomatic handguns, an empty box of 12-gauge shotgun shells, and one live round of .45-caliber ammunition. That evidence sufficiently supported the conclusion that there were weapons in the house. Moreover, the officer also set forth in the affidavit that he recovered empty boxes that likely once contained wireless surveillance cameras and monitors that "have the ability to 'see' in low light conditions." The officer asserted that based on his experience, "these types of cameras are utilized by individuals who engage in the distribution of illegal drugs as counter surveillance, to protect their business and provide early warning of those who might be surveying their residence to include law enforcement." Based on that evidence, the magistrate judge who issued the "no-knock" warrant was well within his discretion to conclude that knocking either might be dangerous or inhibit the effective investigation of this drug crime by allowing for the destruction of contraband evidence. See Richards, 520 U.S. at 394.

Segura-Baltazar argues, nevertheless, that evidence of guns or drugs is not independently sufficient to justify a "no-knock" warrant. Some circuits have found

17

that evidence of a firearm in a home does not alone create a basis for a "no-knock" entry. See, e.g., United States v. Bates, 84 F.3d 790, 795 (6th Cir. 1996) (holding that "[e]vidence that firearms are within a residence, by itself, is not sufficient to create an exigency to officers when executing a warrant"). We need not address that question, because this case involves not only evidence of firearms (including magazines for semiautomatic handguns, an empty box of shotgun shells, and a live .45-caliber round) in the house, but also palpable indicators that the homeowner may have installed countersurveillance security measures that could readily provide the inhabitants with immediate knowledge of police presence on the property. The combination of weapons and countersurveillance devices in this drug case easily provides the reasonable suspicion that knocking would be dangerous or would allow the destruction of evidence. See United States v. Cline, 349 F.3d 1276, 1289-90 (10th Cir. 2003) (finding entry justified when officers waited only ten seconds after knocking where there was evidence of weapons and cameras that would have immediately alerted the suspect that officers were on the property); United States v. Nunn, No. 91-50471, 1992 WL 21586, at *4 (9th Cir. Feb. 10, 1992) (mem. unpublished opinion) (finding a "no-knock" entry justified where officers knew the subject was armed and the house had a closed-circuit camera system monitoring the grounds).

18

We have repeatedly said that when reviewing "the legitimacy of search warrants," we should not examine the "supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process." United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994). We think it abundantly clear that a suspect's privacy and liberty interests are far more likely to be protected when a detached, neutral magistrate has the opportunity to review the evidence and rule on the efficacy of a "no-knock" provision. The police gathered substantial evidence in this drug investigation revealing that there were likely both guns and countersurveillance equipment located in the home, thereby demonstrating a reasonable suspicion that knocking and announcing would have been dangerous. The government need show no more. The "no-knock" provision authorized by the magistrate was proper, and the district court did not err in denying the motion to suppress.

## IV.

Finally, Segura-Baltazar argues, as to sentencing, that the district court "erred in calculating the base offense level using the total weight of methamphetamine mixture seized, rather than only the amount of pure methamphetamine." The defendant was sentenced to 120 months on counts one and two and 60 months on count three, for a total sentence of 180 months. The

19

120-month sentence resulted from a mandatory minimum 10-year requirement for possessing at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine.[5]  The government claims that the argument is moot, that regardless of Segura-Baltazar's base offense level, he was subject to a mandatory minimum of ten years' imprisonment, which is precisely the sentence he received.  Therefore, it says, any error the district court may have made in calculating the guideline range is irrelevant; to the extent the range was lower than 120 months, the mandatory minimum 10-year term controlled.  See U.S.S.G. § 5G1.1(b) ("Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence.").

Segura-Baltazar's argument is not moot.  We believe the argument Segura-Baltazar has made is more in the nature of a challenge to the sufficiency of the evidence.  Essentially, he says that the evidence was insufficient to support the drug quantity necessary to trigger the mandatory minimum.  We do not read his challenge as addressing the district court's guideline calculation.  Rather, we view his argument as saying that the evidence did not establish the existence of at least "500 grams or more of a mixture or substance containing a detectable amount of

---

[5]Segura-Baltazar does not challenge the 60 months he received for count three.

20

methamphetamine, its salts, isomers, or salts of its isomers," which was necessary to trigger the 10-year mandatory minimum. See 21 U.S.C. § 841(b)(1)(A)(viii). That is the argument he made before the district court, that is the argument we believe he makes in his appellate brief, that is the argument the government addressed in its appellate brief, and that is what was discussed at oral argument. Accordingly, we address it now.

Segura-Baltazar waived a jury trial, and the parties presented the district court with a joint set of stipulated facts. In that stipulation, both sides agreed that Officer Gooden, if called, would testify that he recovered from the house at 480 Sheringham Court "1.2 kilograms (net weight) of mixture and substance with a detectible amount of methamphetamine and dimethyl sulfone, a common 'cutting' agent for methamphetamine. The quantitative result of the mixture was less than 1%." If that mixture qualifies as a "mixture or substance containing a detectable amount of methamphetamine" as that phrase is used in 21 U.S.C. § 841(b)(1)(A)(viii), then Segura-Baltazar was subject to a 10-year statutory mandatory minimum, and not a Guideline range of 87 to 108 months, which the parties otherwise agree would have been the correct Guideline recommendation.[6]

---

[6]Moreover, the district court unambiguously said on the record that it would have imposed a sentence of 87 months if it was not bound by the mandatory minimum. So if there was error it was not harmless.

In short, the question is whether the "mixture" in this case satisfies the legal

definition of a "mixture" under section 841. The district court held that it did and

we agree.

As we have noted already, section 841 of Title 21 imposes a 10-year

mandatory minimum for possession of "500 grams or more of a mixture or

substance containing a detectable amount of methamphetamine, its salts, isomers,

or salts of its isomers." 21 U.S.C. § 841(b)(1)(A)(viii). In Chapman v. United

States, 500 U.S. 453 (1991), the Supreme Court squarely ruled that it is proper to

include the weight of a cutting agent when determining the total weight of a

"mixture or substance containing a detectable amount" of a particular drug. Id. at

459-60 (quoting 21 U.S.C. § 841(b)(1)(A)). The Court acknowledged that "[i]n

some cases, the concentration of the drug in the mixture is very low," but

nevertheless determined that Congress intended for the entire mixture or substance

to be weighed so "long as it contains a detectable amount" of the drug. Id. at 459-

61 ("Congress adopted a 'market-oriented' approach to punishing drug trafficking,

under which the total quantity of what is distributed, rather than the amount of pure

drug involved, is used to determine the length of the sentence."). In reaching that

conclusion, the Court described a "mixture" in these terms:

> A "mixture" is defined to include "a portion of matter consisting of
> two or more components that do not bear a fixed proportion to one

another and that however thoroughly commingled are regarded as retaining a separate existence." A "mixture" may also consist of two substances blended together so that the particles of one are diffused among the particles of the other.

Id. at 462 (citation omitted). The Court distinguished a "mixture" from a "container," such as a bottle or a car, from which a drug is easily distinguished and separated. Id. at 462-63.

Here, there is no disagreement that the methamphetamine was combined with dimethyl sulfone, a common cutting agent. Segura-Baltazar simply argued that the mixture was so diluted it would not be marketable or usable on the streets. See United States v. Rolande-Gabriel, 938 F.2d 1231, 1237 (11th Cir. 1991) (adopting a market approach and holding that "[t]he entire weight of drug mixtures which are usable in the chain of distribution should be considered in determining a defendant's sentence"). The district judge rejected the argument at trial and again at sentencing, noting that "I don't necessarily agree with you that nobody on the street would buy it."

Because the methamphetamine undeniably was mixed with a cutting agent, we hold that the district judge properly considered the combined weight of the cutting agent and the methamphetamine in concluding that the government carried its burden of proving the defendant was responsible for at least 500 grams of a

mixture or substance containing a detectable amount of methamphetamine. Quite simply, "Congress has made the policy decision that purity is not an element of § 841(b)(1)(A)(viii)." United States v. Gori, 324 F.3d 234, 239 (3d Cir. 2003) (relying on Chapman and finding threshold for mandatory minimum satisfied where the average purity of the drugs seized was 2.7%). When the weight of the entire mixture is considered, it easily exceeds the 500-gram threshold necessary to trigger the mandatory minimum, and the district court's 10-year sentence was correct.

Segura-Baltazar contends that this case is controlled by United States v. Jackson, 115 F.3d 843 (11th Cir. 1997). We remain unpersuaded. In Jackson, we considered a package that contained some 1004 grams of sugar and 10 grams of cocaine. Notably, the sugar was not used as a cutting agent, but was instead utilized "to trick a purchaser into thinking it was cocaine." Id. at 848. A chemist testified that the cocaine was probably placed on the surface of a block of sugar, and that it likely would not have been detectable if mixed with the sugar. Id. Moreover, the chemist and a police officer testified that the cocaine, as packaged, would not have been marketable on the street. Id. Not surprisingly under these circumstances, we held that the contents of the package did not constitute a "mixture." Id. Jackson is distinguishable, however, because the drugs in that case

were not mixed with a cutting agent and were not marketable or usable. The block of sugar in <u>Jackson</u>, which was essentially used to carry the cocaine, is more analogous to a container than a mixture. See <u>Chapman</u>, 500 U.S. at 462-63. Thus, <u>Jackson</u> does not suggest that the weight of the cutting agent should have been excluded. See <u>United States v. Grant</u>, 397 F.3d 1330, 1336 (11th Cir. 2005) ("We conclude that the district court should use the weight of the liquid LSD [which includes the water carrying medium] in applying Grant's statutory minimum sentence.").

In sum, the district court did not err in declining to suppress the evidence seized from the trash pulls or from the house. Moreover, it correctly considered the combined weight of the methamphetamine and the cutting agent in concluding that the government satisfied its burden of establishing at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine. Thus, we affirm both the conviction and the sentence.

**AFFIRMED**.