[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPT 28, 2010
JOHN LEY
CLERK

No. 10-10327
Non-Argument Calendar
_____

D.C. Docket No. 3:09-cr-00096-WKW-CSC-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JAMES HAROLD GRIFFITH,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(September 28, 2010)

Before CARNES, HULL and ANDERSON, Circuit Judges.

PER CURIAM:

James Harold Griffith appeals his convictions for manufacturing and

possessing methamphetamine and maintaining a place for the purpose of

manufacturing, distributing, or using methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 844(a), and 856(a)(1), and for possessing a firearm in furtherance of a drug trafficking crime and as a convicted felon, in violation of 18 U.S.C. §§ 924(c)(1) and 922(g)(1). On appeal, Griffith argues that the district court clearly erred in denying his motion to suppress evidence. After review, we affirm.

## I. BACKGROUND

A federal grand jury, in a superseding indictment, charged Griffith with (1) manufacturing 50 grams or more of methamphetamine, (2) possessing firearms in furtherance of a drug trafficking offense, (3) two counts of possessing firearms as a convicted felon, (4) maintaining a place for the purpose of manufacturing, distributing, and using methamphetamine, and (5) possessing methamphetamine.

Before trial, Griffith moved to suppress evidence seized during a search of his home, alleging his consent to search was coerced. The magistrate judge held a hearing.

The government called Josh McAlister, a narcotics investigator for the Tallapoosa County Sheriff's Office, who testified that his office received information that Defendant Griffith was manufacturing methamphetamine and that Griffith had an outstanding arrest warrant for failure to appear concerning child support. Investigator McAlister and two other investigators, Fred White and Cliff

2

Scott, went to Griffith's home and knocked on the door. Griffith came outside the house through a different door when the investigators knocked, and McAlister told Griffith he was under arrest. McAlister searched Griffith's person, finding a vial that contained methamphetamine.

Investigator McAlister told Griffith that the investigators had received complaints about Griffith cooking methamphetamine and asked if they could go inside. Griffith then "started explaining that he had items that he had cooked with, but not presently." Griffith "said there were items here and I will show them to you or whatever. I knew this was coming. I'm glad this is over with, those types of things." McAlister testified Griffith "seemed relieved," was "not defensive at all," and told McAlister "that he would be glad to show me whatever."

Investigator McAlister and Investigator White went inside the house with Griffith. McAlister wanted to go inside to talk to Griffith and also because the investigators had seen another man, Lewis Flowers, at the home when they arrived and had information that Flowers had a gun. Once inside, Griffith pointed out the room Flowers was in and called for Flowers to come out. Investigator White also yelled for Flowers to come out. Flowers came out with his hands raised, and the investigators handcuffed Flowers and took Griffith and Flowers outside.

3

Investigator White read Griffith and Flowers their <u>Miranda</u>[1] rights and both men said they understood them.

Investigator McAlister went back into the house with Griffith. McAlister testified they went back inside because Griffith had consented and said he would show McAlister where the methamphetamine paraphernalia was. Griffith "was being very cooperative" and told McAlister "it had been stressing him because he didn't want to be manufacturing dope anymore." Griffith led McAlister to the back bathroom and a camper behind the house where methamphetamine and items used in its manufacture were located and "told [the investigators] everything [they] wanted to know about the manufacturing."

Investigator McAlister testified he asked Griffith for permission to search his property when they were inside the house. McAlister told Griffith that there was an arrest warrant for him and that he would be arrested for the methamphetamine, but the investigators did not have a search warrant and that was why they were talking to him about consent. McAlister did not threaten or coerce Griffith and made him no promises. When asked for consent to search, Griffith said, "[y]es, he would take me to show me whatever." Griffith placed no

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602 (1966).

limitations on the search. Griffith appeared to understand the investigators' questions.

The government's next witness, Investigator White, gave similar testimony. White testified he went into the house with Investigator McAlister and Griffith and Griffith volunteered to call out to Flowers to come out of his room. When Flowers came out of his room, all four men left the house and White read Griffith and Flowers their <u>Miranda</u> rights. White did not threaten or coerce Griffith, and Griffith seemed to understand his rights. Griffith waived his rights and said something to the effect of "I just want to get this over with, man. I'm ready for this to be over with." White testified the investigators took Griffith and Flowers outside for safety reasons, because they did not know where Flowers's gun was and they wanted to get him out of the house.

After he waived his <u>Miranda</u> rights, Griffith took McAlister and White to different places inside the house and to a camper behind the house and showed the investigators drug paraphernalia and items used in the manufacture of methamphetamine.

Investigator White did not hear McAlister make any promises or threats to Griffith or coerce Griffith in any way. White testified that when McAlister searched Griffith and found the vial of methamphetamine, McAlister asked if

Griffith had anything in relation to the methamphetamine in his pocket, and Griffith said, "I got some old stuff. Come on, I want to show you." McAlister told Griffith the investigators did not have a search warrant, though they could apply for one. Griffith was "very cooperative" and "very respectful" toward the investigators, and they were respectful toward Griffith as well.

The defense called Griffith, who testified that when the police arrived at his house, he and Flowers had just finished smoking some methamphetamine. Griffith went outside and asked McAlister what was going on. McAlister told him he had a warrant for Griffith's arrest for a child support violation. McAlister handcuffed him.

Griffith testified that McAlister did not ask to search the house and Griffith did not give consent to search. McAlister asked Griffith who was in the house, and Griffith told him Flowers was there. At that point the two investigators other than McAlister went up to Griffith's front porch, one of them opened the door, and all four men went inside. The investigators asked Griffith to call Flowers out, and he did so. McAlister then patted Griffith down inside the house and pulled out a vial. McAlister looked at it and asked Griffith what he had in the bathroom. Griffith said "whatever you find, take it all because I'm tired of this. Because I was fed up with it, I mean the aggravation."

6

One of the investigators took Flowers outside and the others, without asking for Griffith's consent, took Griffith back to the bathroom and started asking him what everything was. Griffith explained what everything was. Griffith led the investigators to the camper after McAlister asked about it, and Griffith unlocked it for them. McAlister told Griffith he knew where everything was because Griffith's ex-girlfriend had already told the investigators. Griffith was "already inside" and "already caught, so [he] wasn't going to fight [the investigators]," but he never gave them permission.

Griffith testified the reason he went outside to meet the investigators was to keep them out of the house because he knew what was in the house and that it was illegal. However, the investigators "went ahead and pushed me inside anyway." When the investigators took Griffith inside the house, he did not believe he had a choice in the matter. No one discussed consent to search the house. No one read Griffith his <u>Miranda</u> rights until he got to the jail. Investigator White never spoke to Griffith at the house.

On cross-examination, Griffith testified that on the day after his arrest, Griffith made a statement that McAlister typed up and Griffith signed. Griffith acknowledged his statement said that he wanted the investigators to take everything from the house so he could quit using methamphetamine.

7

The magistrate judge issued a report and recommendation (the "report") recommending that Griffith's motion to suppress be denied. In the report, the magistrate judge stated that because the testimony of Griffith and McAlister conflicted on whether Griffith gave the investigators consent to search, the court had to determine the witnesses' credibility. The magistrate judge found Griffith's testimony was not credible and Griffith consented to the search:

> The court recognizes that it is improper to determine credibility based on the "status" of a witness. United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002). Thus, McAllister's [sic] status as a police officer is not determinative. Rather, the court must weigh the testimony of these two witnesses in light of all the facts, taking into account their interests, the consistencies or inconsistencies in their testimony, and their demeanor on the stand. Gallego v. United States, 174 F.3d 1196, 1198 (11th Cir. 1999). When weighing the testimony of Griffith with the testimony of other witnesses, the court finds that Griffith's testimony is not credible. As the defendant in this matter, his interest in the outcome of this case militates against his veracity in this regard. Moreover, Griffith testified that immediately before the officers arrived at the residence, he and Flowers were smoking methamphetamine which does not give the court any confidence in his recollection of the events. The court concludes that Griffith was not credible and, therefore, McAllister [sic] asked for and received consent from Griffith to search.

The magistrate judge also found that Griffith's consent was voluntary. The magistrate judge reasoned that Griffith's presence in his own living room militated against coercion, that his being arrested and handcuffed on the child support

8

warrant was only one factor for the court's consideration, and that there was no evidence that the investigators used coercive or threatening tactics.

The district court adopted the magistrate judge's recommendation and denied the motion to suppress. Griffith objected to the recommendation, arguing the magistrate judge made an improper adverse inference based on his status as a defendant, but the district court determined that the magistrate judge had merely taken into account Griffith's interest in assessing the credibility of his testimony.

At trial, Griffith was convicted on all six counts of the superseding indictment. Griffith was sentenced to 248 months' imprisonment.[2]

## II. DISCUSSION

Griffith argues the district court erred in denying his motion to suppress because the district court's denial of the motion was based on the magistrate judge's clearly erroneous determination that Griffith's testimony was not credible.[3]

---

[2]Griffith had a criminal history category of III and a total offense level of 34 for all counts except Count 2 (firearm possession in furtherance of a drug trafficking offense), yielding an advisory guidelines range of 188 to 235 months' imprisonment. Griffith was subject to a mandatory 5-year consecutive sentence on Count 2 pursuant to 18 U.S.C. § 924(c). Griffith does not appeal his sentence.

[3]"A district court's ruling on a motion to suppress presents a mixed question of law and fact." United States v. Garcia-Bercovich, 582 F.3d 1234, 1238 (11th Cir. 2009), cert. denied, 130 S. Ct. 1562 (2010). We review the district court's factual findings for clear error and its application of law to the facts de novo. Id.

9

"Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002). Therefore, "we should defer to the magistrate judge's determinations unless his understanding of the facts appears to be 'unbelievable.'" Id. "In other words, we must accept the evidence unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." Id. (brackets omitted).

The magistrate judge's determination that Investigators McAlister and White's version of events was more credible than Griffith's is not clearly erroneous. The investigators' testimony was plausible, and it was reasonable for the magistrate judge to conclude that the investigators' testimony that they asked for and obtained Griffith's voluntary consent to enter and search his house was true.

Griffith contends that the magistrate judge improperly based his credibility finding on Griffith's status as a defendant. We disagree. The magistrate judge expressly noted that status-based credibility determinations are improper, and merely took into account Griffith's interest as one factor in determining his

credibility.  The magistrate judge's report, as a whole, does not support Griffith's

claim that the district court decided credibility merely because Griffith was the

defendant and McAlister and White were law enforcement officers.

**AFFIRMED.**