[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-11877

_____

D.C. Docket Nos. 3:11-cv-01084-WKW-CSC; 3:09-cr-00096-WKW-CSC-1

JAMES HAROLD GRIFFITH,

Petitioner-Appellant,

versus

UNITED STATES OF AMERICA,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(September 26, 2017)

Before ED CARNES, Chief Judge, ROSENBAUM and DUBINA, Circuit Judges.

ED CARNES, Chief Judge:

James Harold Griffith was convicted by a jury of several drug and firearms

offenses.  After this Court affirmed his convictions on direct appeal, he filed a 28

U.S.C. § 2255 motion to vacate his sentence.  Among other things, he sought an evidentiary hearing based on his claim that his trial counsel was ineffective for failing to argue that some waste materials in the drug manufacturing process should not have been included as a "mixture or substance" in the drug quantity determination.  That would matter, he claimed, because the drug quantity determination triggered mandatory minimum sentences under 21 U.S.C. § 841(b) and it also increased the base offense level under United States Sentencing Guidelines § 2D1.1, which resulted in a higher guidelines range.

The district court denied Griffith's § 2255 motion without an evidentiary hearing and denied him a certificate of appealability.  We granted him a COA on the limited issue of whether he should get an evidentiary hearing on his ineffective assistance claim relating to the calculation of his drug quantity.

I.  FACTS AND PROCEDURAL HISTORY

A.  Griffith's Trial and Sentence Proceedings

In February 2008 officers from the Tallapoosa County Narcotics Task Force arrested Griffith at his residence.  After searching him and the premises, the officers collected a contact lens case containing methamphetamine, as well as several jars and bottles containing "bi-layer liquids."[1]

---

[1] A "bi-layer liquid" is what it sounds like it would be:  a layer of one type of liquid on top of another layer of a different type of liquid.

2

The superseding indictment charged Griffith with manufacturing 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (Count 1); possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 2); two counts of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Counts 3 and 6); maintaining a place for manufacturing methamphetamine, in violation of 21 U.S.C. § 856(a)(1) (Count 4); and possession of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 844(a) (Count 5).  Count 1 carried with it a statutory sentence enhancement if the weight of the "mixture or substance" containing a detectable amount of methamphetamine was over a certain amount.  21 U.S.C. § 841(b)(1)(B)(viii).[2]

During the two-day jury trial in October 2009, the government presented the evidence seized from Griffith's home and put on several witnesses, including

---

[2] For a manufacturing methamphetamine offense, the total amount of the drug generally determines the penalty range, which is set by statutory minimum and maximum. See 21 U.S.C. § 841(b).  If a defendant has a prior conviction for a felony drug offense and "50 grams or more of methamphetamine . . . or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine" were involved in the current offense, the range is 20 years to life. Id. § 841(b)(1)(A)(viii).  If a defendant has a prior conviction for a felony drug offense and "5 grams or more of methamphetamine . . . or 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine" were involved in the current offense, the range is 10 years to life.  Id. § 841(b)(1)(B)(viii).  For all other methamphetamine offenses, the range is zero to 30 years for a defendant with a prior felony drug conviction.  See id. § 841(b)(1)(C).  Those ranges differ if death or serious injury resulted from the use of the drug. Id. § 841(b)(1)(A)–(C).

3

Melissa Armstrong, a forensic drug chemist at the Alabama Department of Forensic Sciences. She described some of the evidence, explained the methods she used in analyzing it, and testified to the results of her analyses. The results of those analyses are central to the issue before us. Item 1 of the evidence was the contact lens case, and Armstrong determined that it contained 0.31 grams of methamphetamine.[3] Item 2 was a glass bottle that contained powder and liquid, which Armstrong analyzed. She "took two samples of [the] liquid, dried those down, got a powder, and then analyzed those." She testified that "[t]he liquid . . . contained the presence of pseudoephedrine" and weighed 15.20 grams.

Items 3 through 6 were glass containers containing bi-layer liquids. The top layers of those items all tested positive for the presence of either methamphetamine or pseudoephedrine, while the bottom layers all tested negative. Specifically, the top layer of Item 3 contained the presence of pseudoephedrine and weighed 109.70 grams; the top layer of Item 4 contained the presence of methamphetamine and weighed 106.20 grams; the top layer of Item 5 contained the presence of methamphetamine and weighed 21.65 grams; and the top layer of Item 6 contained the presence of methamphetamine and weighed 22.02 grams. The combined weight of the top layer of liquids containing the presence of methamphetamine was 150.18 grams, and the combined weight of the top layers of liquids containing the

---

[3] For ease of reference, we have designated the relevant pieces of evidence as an "Item" followed by a number.

4

presence of pseudoephedrine was 124.90 grams.  The bottom layers of liquid were not included in calculating the total weights.  In addition to Armstrong's testimony, the government put into evidence Armstrong's lab report with the results of her analyses.

On cross examination Griffith's counsel briefly questioned Armstrong about her method of analyzing the liquids.  He asked her why she had analyzed the liquid instead of the powder in Item 2, and how much of that liquid had evaporated from the day she tested it until the day she testified.  Counsel's questions basically sought to have Armstrong clarify her testimony.

After the government rested, Griffith's counsel moved for a judgment of acquittal.  About the amount of methamphetamine manufactured, he argued to the court:

> [T]here has also been no showing that the 50 grams and each of these substances they've been talking about was manufactured on or about February 25th, 2008, or that my client had actually manufactured any particular amounts.  There's also been no showing that the mixture or substance was usable in any form.  Obviously, I think there's some case authority that says, you know, pitching some meth into a barrel of water, you can't use that whole weight as a — as evidence of conviction to put weight on someone.

The district court reserved a ruling on the motion for judgment of acquittal. Griffith did not testify himself or present any witnesses.  His counsel renewed his motion for a judgment of acquittal, and the court again reserved ruling on it.

5

The jury returned a guilty verdict on all six counts.  Because the jury found Griffith guilty of unlawfully manufacturing a controlled substance in violation of 21 U.S.C. § 841(a), as charged in Count 1, the special verdict form required it to determine "the weight of the mixture or substance containing a detectable amount of methamphetamine attributable to [Griffith]."[4]  The jury found that the weight of the mixture or substance containing a detectible amount of methamphetamine was 150.18 grams.  The district court later denied Griffith's motion for a judgment of acquittal.

Using the 2009 edition of the United States Sentencing Guidelines, the presentence investigation report grouped Counts 1, 3, 4, 5, and 6 because those counts were closely related.  (We will refer to them as the grouped counts.)  The PSR treated Count 2 separately because it was subject to a mandatory minimum sentence that was required to run consecutively to any other sentence.  18 U.S.C. § 924(c); U.S.S.G. §§ 3D1.1(a), 3D1.2(d).  To calculate Griffith's base offense

---

[4] The jury verdict form, as to Count 1, was two-fold:

> As to Count 1 of the indictment, that on or about February 25, 2008, Defendant James Harold Griffith manufactured a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(l) we, the jury, find the defendant:

> Not Guilty _____    or    Guilty _____

>> If guilty of Count 1, we, the Jury, find that the weight of the mixture or substance containing a detectable amount of methamphetamine attributable to Defendant James Harold Griffith is: _____.

After finding Griffith guilty, the jury wrote in 150.18 grams as the weight of the mixture or substance.

level, the PSR applied § 2D1.1's drug equivalency tables to the drug amounts listed in the laboratory report that the government had introduced at trial. Those drug amounts were 150.18 grams of methamphetamine and 124.90 grams of pseudoephedrine, which resulted in a base offense level of 32.[5] His offense level was boosted by two points for unsafe storage of chemicals, and his six criminal history points put him in category III.

The PSR noted that Griffith was subject to a statutory mandatory minimum sentence of 120 months on Count 1 (based on the weight of the "mixture or substance" and his previous felony drug conviction, see 21 U.S.C. §§ 841(b), 851) and a mandatory consecutive 60-month sentence on Count 2 (the § 924(c) count), as well as a supervised release period of not less than 96 months. (The consecutive 120-month and 60-month minimum sentences made a total of 180 months imprisonment the mandatory minimum sentence.) As to the guideline provisions, the PSR stated: "Based upon a total offense level of 34, and a criminal history category of III, the guideline range of imprisonment is 188 to 235 [months]. The defendant is also subject to a mandatory consecutive [60-month] sentence, pursuant to USSG § 2K2.4."

---

[5] "Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level." U.S.S.G. § 2D1.1 cmt. n.12 (2009); see id. § 1B1.3(a)(2), cmt. background.

7

At the sentence hearing Griffith's counsel said he had no objections to the PSR and its guideline calculations, but he did argue for a downward variance. The district court adopted the PSR, and after hearing from the government and Griffith and considering the § 3553(a) factors, the court sentenced Griffith to a total of 248 months imprisonment: 188 months (which was the bottom of the guidelines range) on Counts 1, 3, 4, 5, and 6 to be served concurrently, and it sentenced him to 60 months on Count 2 to be served consecutively.[6] His total sentence of 248 months imprisonment was 68 months higher than his total mandatory minimum sentence of 180 months. The court also ordered 96 months of supervised release to follow his imprisonment. Defense counsel said he had no objections to the sentence.

Represented by the same counsel, Griffith appealed his convictions, arguing that the district court clearly erred in denying his motion to suppress evidence. United States v. Griffith, 397 F. App'x 613, 614 (11th Cir. 2010). We affirmed. Id.

### B.  Griffith's § 2255 Proceedings

In December 2011 Griffith filed a pro se § 2255 motion, alleging ineffective assistance of counsel during all phases of his case. He asserted that counsel performed deficiently by failing (1) to conduct an adequate pretrial and

---

[6] In October 2016, the district court granted Griffith's 18 U.S.C. § 3582(c)(2) motion for a sentence reduction based on Amendment 782 and reduced his sentence from 248 months to 211 months.

8

presentence investigation; (2) to obtain an independent expert witness to analyze the liquids seized by police and to testify as to the amount of usable methamphetamine that could be produced from the liquids; (3) to properly cross-examine the government's expert witness about the quantity of usable methamphetamine that could be produced from the liquids; (4) to object to a jury instruction addressing whether he manufactured a "mixture or substance" containing methamphetamine; (5) to oppose the drug quantities in the PSR and adopted by the district court; and (6) to challenge on appeal the jury instructions, drug quantities, or sufficiency of the evidence as to the charges of manufacturing methamphetamine and maintaining drug-involved premises.

Griffith attached to his § 2255 motion a memorandum, a sworn affidavit, and a page from Armstrong's lab report showing the results of her analyses. In his memorandum he outlined the process that he had used to manufacture methamphetamine and asserted, among other things, that the byproducts of the process were counted against him in convicting and sentencing him. He alleged that the liquids that were "counted against [him]" were mostly "toxic" "waste materials" that were "unusable." He also stated that he started with only 2.4 grams of pseudoephedrine and that "[i]t is impossible to turn 2.4 Grams of Pseudoephedrine into more than 2.4 Grams of Methamphetamine." Griffith argued that he was prejudiced by counsel's deficient performance because, had counsel

9

presented the court with binding authority about what constitutes a "mixture or substance," he would have received a shorter sentence and a lower base offense level.

In his affidavit Griffith stated that he told counsel "almost every[ ]time . . . I spoke with him that I only started with 2.4 Grams of Pseudoephedrine . . . and therefore it was humanly impossible to manufacture 50 [ ] grams of methamphetamine." He also swore that he told counsel "on numerous occasions that the liquids seized by the police were unusable in their current form and were mostly nothing more than the waste materials [from] the one multi-step process that I was conducting to make a small amount of methamphetamine for my own personal use." He stated that, nonetheless, counsel maintained that the entire amount of the liquids could be used to determine his sentence.

As directed by the district court, Griffith's former counsel filed an affidavit. He stated that, although he "was aware of possible problems" with the government's two toxicology reports — "one from the state and one from the federal government with different amounts shown as submitted" — he determined that an independent expert was not warranted because he was satisfied that the prosecutors, at his insistence, "reconcile[d] any differences in the reports."[7] He

---

[7] It is not clear what the federal government's toxicology report showed because that report was apparently never introduced at trial and it is not part of the record in this appeal. In any event, whatever that report showed, it would not change the result of this appeal.

10

also stated that he did not know what Griffith meant by "usable," "but [he] assume[d] that he mean[t] amount of substance which if ingested will get the necessary effect." He said he didn't cross-examine Armstrong on whether the substances were "usable" because, based on his understanding of the term, he didn't think that it was "within the scope of her expertise." As to whether the substances amounted to "mixture[s]," he explained that, after he had talked "with both probation and the Government on that issue," he concluded that the substances were "mixture[s]," so he was "satisfied that the calculations were correct." He elaborated: "I think the [c]ourts have said that for instance methamphetamine is not a mixture where meth is thrown in a barrel of water. In this instance the methamphetamine was in process in [Griffith's] lab. The amounts used were not objectionable to me at the time."

After the government responded in opposition to Griffith's § 2255 motion, a magistrate judge concluded that an evidentiary hearing was not required and recommended denying the motion with prejudice. In his objections, Griffith argued, among other things, that the magistrate judge had erred in determining that counsel was not ineffective for failing to properly develop the argument about an incorrect drug amount being attributed to him. The district court overruled his objections, adopted the magistrate judge's report, and denied with prejudice Griffith's § 2255 motion without an evidentiary hearing.

11

We granted Griffith a certificate of appealability on the following issue:

Whether, regarding Griffith's claims about counsel's ineffectiveness in not challenging the nature and quantity of substances for which he was held responsible, the district court erred by not holding an evidentiary hearing on Griffith's assertions that his counsel failed to present the defense that:

> (1) the substances did not constitute 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, under 21 U.S.C. § 841(b); and
>
> (2) the substances were not "usable" for purposes of determining drug quantity at sentencing under U.S.S.G. § 2D1.1.

## II.  STANDARD OF REVIEW

We review for abuse of discretion the denial of an evidentiary hearing in a § 2255 proceeding.  Aron v. United States, 291 F.3d 708, 714 n.5 (11th Cir. 2002).  "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous."  Hartford Cas. Ins. Co. v. Crum & Forster Specialty Ins. Co., 828 F.3d 1331, 1333 (11th Cir. 2016) (quotation marks omitted).

## III.  DISCUSSION

Griffith contends that he is entitled to an evidentiary hearing based on his allegations that his counsel was ineffective in failing to argue that the entire weight of the liquids attributed to him should not have been included in calculating the

12

drug quantities under 21 U.S.C. § 841(b) or U.S.S.G. § 2D1.1(c).[8]  In rejecting that

contention, the district court erred.

Under 28 U.S.C. § 2255(b) an evidentiary hearing must be held on a motion

to vacate "[u]nless the motion and the files and records of the case conclusively

show that the prisoner is entitled to no relief."  "[I]f the petitioner alleges facts that,

if true, would entitle him to relief, then the district court should order an

evidentiary hearing and rule on the merits of his claim."  Aron, 291 F.3d at 714–15

(quotation marks omitted).  "[A] petitioner need only allege — not prove —

reasonably specific, non-conclusory facts that, if true, would entitle him to relief.

If the allegations are not affirmatively contradicted by the record and the claims are

not patently frivolous, the district court is required to hold an evidentiary hearing."

Id. at 715 n.6.

To show that he is entitled to an evidentiary hearing on his ineffective

assistance of counsel claim, Griffith's § 2255 motion must allege facts that would

show (1) "that counsel's performance was deficient" and (2) "that the deficient

performance prejudiced the defense."  See Strickland v. Washington, 466 U.S. 668,

---

[8] Griffith also makes several other contentions but we will not consider them because they were not preserved in the district court and are also beyond the scope of the COA.  See Ferguson v. Sec'y, Dep't of Corr., 580 F.3d 1183, 1193 (11th Cir. 2009) ("When reviewing the district court's denial of a habeas petition," this Court "do[es] not consider issues or arguments raised for the first time on appeal."); Johnson v. United States, 340 F.3d 1219, 1228 n.8 (11th Cir. 2003) ("Arguments not raised in the district court are waived."); Murray v. United States, 145 F.3d 1249, 1251 (11th Cir. 1998) ("[I]n an appeal brought by an unsuccessful habeas petitioner, appellate review is limited to the issues specified in the COA.").

13

687, 104 S. Ct. 2052, 2064 (1984); <u>Aron</u>, 291 F.3d at 715 n.6.  "The proper measure of attorney performance [is] simply reasonableness under prevailing professional norms," <u>Strickland</u>, 466 U.S. at 688, 104 S. Ct at 2065, and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," <u>id.</u> at 690, 104 S. Ct. at 2066.  To establish deficient performance, a petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  <u>Id.</u> at 687, 104 S. Ct. at 2064; see <u>United States v. Freixas</u>, 332 F.3d 1314, 1320 (11th Cir. 2003) ("[A] petitioner must establish that no competent counsel would have taken the action that his counsel did take.") (quotation marks omitted).  When the law is well established, a lawyer's ignorance of it can amount to deficient performance.  <u>See</u> <u>Smith v. Singletary</u>, 170 F.3d 1051, 1054 (11th Cir. 1999) ("Ignorance of well-defined legal principles is nearly inexcusable.").

For a § 2255 claim to succeed, a petitioner also must show prejudice.  To do that, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694, 104 S. Ct. at 2068.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  <u>Id.</u>

14

Griffith alleged in his § 2255 motion that the liquids used to calculate his drug quantities were "unusable" toxic materials from the manufacturing process, and that he started with only 2.4 grams of pseudoephedrine and it "is impos[s]ible to turn 2.4 [g]rams of pseudoephedrine into more than 2.4 [g]rams of [m]ethamphetamine." He asserted that he repeatedly told counsel those facts "from the very begin[n]ing," but counsel failed to argue that the liquids were not a usable "mixture or substance."

Griffith also described the three-step process he used to manufacture methamphetamine. First, "the [p]seudoephedrine is extracted from [pseudoephedrine] pills in one container using various toxic liquids." Second, "the ephedrine extracted is drained off into a[n]other container and mixed with additional toxins to convert it to a liquid form of methamphetamine." Finally, "the liquid methamphetamine is placed . . . in another container where it is converted to a 'usable' powder." He alleged that "the liquids [attributed to him] were all a part of one multi-step process where [he] only started with 2.4 [g]rams" of pseudoephedrine, and that the liquids containing pseudoephedrine were "the first part of the process" while the ones containing methamphetamine were "the second step in the process." There was nothing in the trial record to contradict his allegations or to show that the liquids were usable or capable of producing over 2.4 grams of methamphetamine.

15

As a result, at this stage of the proceedings we must accept that unusable liquids were counted in calculating the drug quantities that determined his mandatory minimum sentence and his advisory guidelines base offense level. We must also accept for present purposes that the liquids could not have produced any more than 2.4 grams of methamphetamine.[9]

## A.  Deficient Performance

Since before the time of Griffith's trial, the law of this circuit has been that we apply the "marketable" or "usable" approach to determine the weight of a "mixture or substance." Given that law, and accepting as true the facts alleged by Griffith, his counsel's failure to challenge the weight calculations amounted to deficient performance, particularly because the drug quantities were the basis of Griffith's mandatory minimum sentence and higher guidelines range. Hinton v. Alabama, 571 U.S. __, 134 S. Ct. 1081, 1089 (2014) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable

---

[9] Griffith alleged that the 0.31 grams of methamphetamine (from Item 1) found in the contact lens case "was some of the 2.4 [g]rams [of] pseudoephedrine that he started with."

Of course, while we must accept the specific allegations as true for purposes of determining if Griffith is entitled to an evidentiary hearing, after hearing Griffith's testimony the district court is not required to credit it and may instead reject his testimony as untrue even if it is not contradicted by other evidence. See, e.g., Burston v. Caldwell, 506 F.2d 24, 26 (5th Cir. 1975)); see also Negron v. City of Miami Beach, 113 F.3d 1563, 1570 (11th Cir. 1997); Murphy v. City of Flagler Beach, 846 F.2d 1306, 1310 (11th Cir. 1988); United States v. Samples, 897 F.2d 193, 198 (5th Cir. 1990) ("The trier of fact need not credit any witness' testimony, even if unimpeached.").

16

performance under Strickland.").  And there is no conceivable strategic basis for counsel's failure to object and pursue the issue.

The term "mixture or substance" comes from the statutory provision that establishes different penalties for different drug offenses.  See 21 U.S.C. § 841(b).  Section § 841(a) prohibits, among other things, the unauthorized manufacture of a controlled substance, and § 841(b) provides the penalties for violating that prohibition.  The severity of the penalties is provided through mandatory minimum sentences, the application of which are dependent on the quantity of the "mixture or substance containing a detectable amount" of a controlled substance that was involved in the offense.  Id. § 841(b).

Section 2D1.1(c) of the United States Sentencing Guidelines sets out base offense levels keyed to drug quantities.  It uses the same "mixture or substance" language from 21 U.S.C. § 841(b), setting a defendant's base offense level based on "the entire weight of any mixture or substance containing a detectable amount of the controlled substance."  U.S.S.G. § 2D1.1(c) n.*(A) (2009).  When the offense involves methamphetamine, courts are to "use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the . . . methamphetamine (actual), whichever is greater."  Id. n.*(B).

For years courts grappled with what should be included in determining the weight of a "mixture or substance" when other materials — such as cutting

17

agents,[10] waste liquids, or ingestible non-drug products — are intermixed with or contain the controlled substance. In Chapman v. United States, the Supreme Court addressed what the term "mixture or substance" means in the context of an offense involving LSD and blotter paper. 500 U.S. 453, 111 S. Ct. 1919 (1991). The Court rejected the defendants' argument that the blotter paper should not have been included in the drug weight and held that the district court did not err in using the total weight of the paper and LSD (5.7 grams) — instead of the weight of the LSD alone (0.05 grams) — in determining the defendants' mandatory minimum sentences under § 841(b) and base offense levels under the sentencing guidelines. Id. at 455, 459, 111 S. Ct. at 1922, 1924.

The Chapman decision's holding that blotter paper should be included in the weight was based primarily on the fact that LSD is usually sold and ingested on blotter paper. The Court explained that LSD is typically dissolved into a solution, sprayed onto blotter paper, and that paper is then swallowed, licked, or dropped into a drink. Id. at 457, 111 S. Ct. at 1923. As with heroin and cocaine, the Court said, "Congress clearly intended the dilutant, cutting agent, or carrier medium to be included in the weight of [the] drugs for sentencing purposes" because those ingredients are combined with the drugs and "the mixture is then sold to

---

[10] A cutting agent is a substance that is less expensive than a particular drug and is used to dilute the drug, in turn giving a seller a larger amount of the product to sell. For example, a seller could "cut" his cocaine with aspirin or flour and in that way increase the amount of the salable product.

18

consumers." Id. at 460, 111 S. Ct. at 1924.  It added that, in enacting § 841, "Congress adopted a 'market-oriented' approach . . . ." Id. at 461, 111 S. Ct. at 1925 ("[Congress] intended the penalties for drug trafficking to be graduated according to the weight of the drugs in whatever form they were found — cut or uncut, pure or impure, ready for wholesale or ready for distribution at the retail level.").  "By measuring the quantity of the drugs according to the 'street weight' of the drugs in the diluted form in which they are sold, rather than according to the net weight of the active component, the statute and the Sentencing Guidelines increase the penalty for persons who possess large quantities of drugs, regardless of their purity.  That is a rational sentencing scheme." Id. at 465, 111 S. Ct. at 1927–28 (emphasis added); see also id. at 466, 111 S. Ct. at 1928 ("Although LSD is not sold by weight, but by dose, and a carrier medium is not, strictly speaking, used to 'dilute' the drug, that medium is used to facilitate the distribution of the drug.  Blotter paper makes LSD easier to transport, store, conceal, and sell.  It is a tool of the trade for those who traffic in the drug . . . .").

Because neither the statute nor the guidelines defined the word "mixture," the Supreme Court gave the term its ordinary meaning:  "a portion of matter consisting of two or more components that do not bear a fixed proportion to one another and that however thoroughly commingled are regarded as retaining a separate existence," or "two substances blended together so that the particles of

19

one are diffused among the particles of the other." Id. at 462, 111 S. Ct. at 1926.

In determining whether LSD on blotter paper was a "mixture," the Court stated:

> LSD is applied to blotter paper in a solvent, which is absorbed into the paper and ultimately evaporates. After the solvent evaporates, the LSD is left behind in a form that can be said to "mix" with the paper. The LSD crystals are inside of the paper, so that they are commingled with it, but the LSD does not chemically combine with the paper. Thus, it retains a separate existence and can be released by dropping the paper into a liquid or by swallowing the paper itself. The LSD is diffused among the fibers of the paper. Like heroin or cocaine mixed with cutting agents, the LSD cannot be distinguished from the blotter paper, nor easily separated from it. Like cutting agents used with other drugs that are ingested, the blotter paper, gel, or sugar cube carrying LSD can be and often is ingested with the drug.

Id. (emphasis added). Because the LSD and the blotter paper amounted to a "mixture or substance containing a detectable amount" of LSD, the Court concluded that § 841(b) "requires the weight of the carrier medium to be included when determining the appropriate sentence for trafficking in LSD." Id. at 468, 111 S. Ct. at 1929.

Two months after the Supreme Court's Chapman decision, this Court addressed whether the calculation of a defendant's base offense level should include the weight of an entire mixture of cocaine, a cutting agent, and liquid waste, or only the mixture of cocaine and the cutting agent remaining after the liquid waste was removed. United States v. Rolande-Gabriel, 938 F.2d 1231, 1232–33 (11th Cir. 1991). Following the "marketable" or "usable" approach set out in Chapman, we concluded that "[t]he entire weight of drug mixtures which are

20

usable in the chain of distribution should be considered in determining a defendant's sentence." Id. at 1238. We held that the defendant should have been sentenced based on the weight of the usable powder consisting of only the cutting agent and the cocaine base, and not including the liquid waste, which could be "easily distinguished from, and separated from" the cocaine mixture.[11] Id. at 1237–38; id. at 1237 ("[I]t is fundamentally absurd to give an individual a more severe sentence for a mixture which is unusable and not ready for retail or wholesale distribution while persons with usable mixtures would receive far less severe sentences."). We explained that our analysis was consistent with the Chapman decision because, "[w]hile LSD is ready for sale, use, or consumption when it is placed on standard carrier mediums such as blotter paper, gel, or sugar cubes, the cocaine mixture in this case was obviously unusable while mixed with the liquid waste material." Id. at 1237; see also, e.g., United States v. Bristol, 964 F.2d 1088, 1089–90 (11th Cir. 1992) (holding that the weight of wine used as a medium to transport cocaine should not have been included in determining the drug weight for the defendant's base offense level because the mixture was "unusable").

---

[11] In Rolande-Gabriel, we noted that the "government chemist easily distinguished the liquid from the drug powder and its cutting agent, characterizing it as 'non-drug waste.'" 938 F.2d at 1237. We don't have similar testimony or findings of fact here, but that, of course, is the evidence that Griffith seeks to uncover and present at an evidentiary hearing.

21

We later addressed the term "mixture or substance" in a case in which several defendants had been convicted for conspiracy to manufacture and to possess with intent to distribute methamphetamine. See United States v. Newsome 998 F.2d 1571, 1574 (11th Cir. 1993).  The "mixture[s] or substance[s]" in question were methamphetamine oil and methamphetamine sludge.[12]  Id.  The issues included whether, in determining the drug weight for the defendants' base offense level, the district court had erred in including the weight of the projected yield of the methamphetamine oil instead of only the weight of the methamphetamine oil itself, and also whether it had erred in including the weight of the methamphetamine sludge.  Id. at 1575–59.

On the methamphetamine oil issue, we held in Newsome that the district court did not err in using the projected yield instead of the actual weight of the oil. Id. at 1578.  We explained that our Court had already approved a district court's quantity finding based on the fact that "110 pounds [that is, about 50 kilograms] of phenylacetic acid, a precursor chemical for methamphetamine, could be processed into 30 kilograms of methamphetamine."  Id.  We saw "no principled distinction for sentencing purposes between 'precursor chemicals' destined for conversion

---

[12] Methamphetamine oil is "crystallize[d]" to produce methamphetamine, while methamphetamine sludge is a toxic byproduct of the manufacturing process.  Newsome, 998 F.3d at 1574, 1578.

into a controlled substance and combinations of those chemicals that have been partially processed and are closer to the finished product." Id.

We held, however, that the district court had erred in including in the quantity determination the weight of the methamphetamine sludge because it was not a "good[ ] in progress that would have eventually become some amount of marketable methamphetamine." Id. Instead, it was an "unusable" and "toxic" substance that contained less than 1% methamphetamine. Id. We reasoned that it would make no sense to sentence the defendants based on the weights of materials "that would never find their way to methamphetamine consumers." Id. We cited our Rolande-Gabriel decision in support of our conclusion in Newsome that the weight of the sludge should not have been used in calculating the defendants' base offense level under § 2D1.1. Id. at 1579.

Other circuits at that time had interpreted the term "mixture or substance" differently. See Walker v. United States, 506 U.S. 967, 967, 113 S. Ct. 443, 443 (1992) (White, J., dissenting from the denial of certiorari) (noting that our Circuit, along with the Second, Third, Sixth, and the Ninth Circuits had adopted the approach that "sentences should not [be] based on the total weight of the liquid" for sentencing purposes under § 2D1.1 of the guidelines, while the Fifth and Tenth Circuits were taking the opposite approach). Because of the "inter-circuit conflict" over the meaning of "mixture or substance," the United States Sentencing

23

Commission amended the sentencing guidelines to clarify what the term "mixture or substance" means for purposes of the guidelines. U.S.S.G. app. C, amend. 484. Effective November 1, 1993, application note 1 of § 2D1.1 provided:

> "Mixture or substance" as used in this guideline has the same meaning as in 21 U.S.C. § 841, except as expressly provided. <u>Mixture or substance does not include materials that must be separated from the controlled substance before the controlled substance can be used.</u> Examples of such materials include the fiberglass in a cocaine/fiberglass bonded suitcase, beeswax in a cocaine/beeswax statue, and waste water from an illicit laboratory used to manufacture a controlled substance. If such material cannot readily be separated from the mixture or substance that appropriately is counted in the Drug Quantity Table, the court may use any reasonable method to approximate the weight of the mixture or substance to be counted.

U.S.S.G. § 2D1.1 n.1 (emphasis added). In other words, the Commission wrote our position into the guidelines.

The Commission explained that, after the Supreme Court's <u>Chapman</u> decision, the issue over the meaning of the term "mixture or substance" had arisen in "two types of cases." U.S.S.G. app. C, amend. 484. The first is where a controlled substance is "bonded to, or suspended in, another substance," but the controlled substance is "not usable" until separated from the other substance. <u>Id.</u> It added:

> The second type of case involves the waste produced from an illicit laboratory used to manufacture a controlled substance or chemicals confiscated before the chemical processing of the controlled substance is completed. The waste product is typically water or chemicals used to either remove impurities or form a precipitate (the precipitate, in some cases, being the controlled substance). Typically, a small

24

amount of controlled substance remains in the waste water; often this amount is too small to quantify and is listed as a trace amount (no weight given) in DEA reports.  In these types of cases, the waste product is not consumable.  The chemicals seized before the end of processing are also not usable in that form because further processing must take place before they can be used.

Id.  Amendment 484 confirmed that, under the guidelines, a "mixture or substance" does not include "materials that must be separated from the controlled substance before the controlled substance can be used."  Id.

Since the Chapman, Rolande-Gabriel, and Newsome decisions and the 1993 amendment of the sentencing guidelines, this Court has had several opportunities to decide whether certain materials amount to a "mixture or substance" for purposes of 21 U.S.C. § 841(b) and U.S.S.G. § 2D1.1(c).  For example, in United States v. Jackson, we held that the weight of sugar, which comprised 99% of a "mixture" containing cocaine, should not have been included in the drug weight for determining a defendant's base offense level.  115 F.3d 843, 848–49 (11th Cir. 1997).  The reason was that the sugar "was not used as a cutting agent but was used to trick a purchaser into thinking it was cocaine" and it rendered the mixture "unmarketable."  Id. at 848.

On the other hand, in United States v. Grant, we held that the weight of a liquid containing LSD — not merely the weight of the pure LSD alone — should be used in determining a defendant's mandatory minimum sentence under § 841(b).  397 F.3d 1330, 1332, 1336 (11th Cir. 2005).  Even though liquid LSD

25

"is not the way LSD is typically marketed," we pointed out that "consumers can get high by drinking liquid LSD." Id. at 1333 n.7. Which meant that the liquid LSD was usable. We explained that, "[u]nder Chapman, liquid LSD can be characterized as the carrier medium of choice at the wholesale level," just as LSD on blotter paper can be characterized as the carrier medium of choice at the retail end of the distribution chain. Id. at 1336 (citing Chapman, 500 U.S. at 462, 111 S. Ct. at 1926). For that reason, "the district court should use the weight of the liquid LSD in applying [the defendant's] statutory minimum sentence" under § 841(b). Id.

Along the same lines, in United States v. Segura-Baltazar, we held that "dimethyl sulfone, a common 'cutting' agent for methamphetamine," was properly included in determining the total weight of a "mixture or substance containing a detectable amount of methamphetamine" for purposes of § 841(b). 448 F.3d 1281, 1292–93 (11th Cir. 2006). In that case the defendant had analogized his case to the Jackson case, arguing that the mixture of methamphetamine and the cutting agent should not have been used in determining his mandatory minimum under § 841(b) because "the mixture was so diluted it would not be marketable or usable on the streets." Id. at 1293. We distinguished Jackson, explaining that in it the "block of sugar" was "essentially used to carry the cocaine," making it more like "a container than a mixture." Id. Relying on the Chapman decision, we rejected the

26

defendant's argument that the mixture was not "usable," holding instead that the mixture of the methamphetamine and the cutting agent "satisfies the legal definition of a 'mixture' under section 841." Id. at 1292–93.

In Rolande-Gabriel we explained that the Chapman decision had established that: "The entire weight of drug mixtures which are usable in the chain of distribution should be considered in determining a defendant's sentence." Rolande-Gabriel, 938 F.2d at 1237. But unusable parts that must be separated and waste products are not to be considered in the calculations. Our precedent is clear that, when calculating the weight of a "mixture or substance" containing a detectable amount of a controlled substance, we follow the "'market-oriented' approach" set out in Chapman. See 500 U.S. at 461, 111 S. Ct. at 1925; Grant, 397 F.3d at 1336; Segura-Baltazar, 448 F.3d at 1292–93.

In allegedly failing to research our circuit law on this obvious issue, which was critically important to Griffith's case, his counsel rendered deficient performance. Hinton, 134 S. Ct. at 1089. Griffith says that he repeatedly told counsel from the beginning that the liquids in question were not "usable," and at the time of Griffith's trial our circuit law was, as it is now, that a court may consider only the "weight of drug mixtures which are usable in the chain of distribution . . . in determining a defendant's sentence." See Rolande-Gabriel, 938 F.2d at 1238; Grant, 397 F.3d at 1333 n.7, 1336.

27

There is one indication that counsel may have been aware of the correct rule. When he moved for a judgment of acquittal, counsel stated that the government had not shown "that the mixture or substance was usable in any form." But he failed to pursue the matter further or to object on that basis at sentencing. And counsel's affidavit filed in the district court during this § 2255 proceeding motion indicates that he was not aware of our circuit law on what is a usable "mixture or substance." In that affidavit counsel states that he did not question forensic drug chemist Armstrong, the government's expert, about whether the liquids were usable because he did not know what Griffith meant when he said that they were not usable: "I don't know what [Griffith] means by 'usable' but I assume that he means amount of substance which if ingested will get the necessary effect. I don't think that is within the scope of [Armstrong's] expertise and did not [question her about it]."

Counsel never asked Armstrong whether the liquids seized from Griffith's home were a usable "mixture or substance." Nor did he ask her if the liquids were waste products, or if the liquids were precursor materials that could be used to manufacture methamphetamine but not consumed themselves. Nor did counsel present or seek to obtain his own evidence about the nature and properties of the liquids. He never pursued any line of questioning or arguments about whether the

28

liquids that were counted against Griffith could properly be considered a usable "mixture or substance."

Instead of researching the law and investigating the facts himself, Griffith's counsel relied on the government's analyses of and its witness' testimony about the liquids, as well as his discussions "with both probation and the Government," to conclude that the liquids attributed to Griffith "were not objectionable." As his affidavit demonstrates, counsel's choice not to question Armstrong on the composition of the liquids or pursue additional evidence about the liquids was not based on any strategy or tactic but instead was the result of a misunderstanding of the term "usable." The upshot is that Griffith has alleged facts that, if true, would establish that counsel's performance was deficient in failing to challenge the drug quantities attributed to Griffith. See Smith, 170 F.3d at 1054; Hinton, 134 S. Ct. at 1089.

The district court's reasoning in concluding otherwise is flawed. The magistrate judge's report stated that, unlike the situation in the Rolande-Gabriel and Segura-Baltazar cases, "there was no testimony or factual findings regarding the usability or marketability of the drug mixtures" in this case. "Consequently" — it concluded — "the outcome of this case is not controlled by either of those two decisions. The district court adopted the report. In doing so, the court missed the thrust of Griffith's ineffective assistance of counsel claim. He claims that the

29

reason there was no testimony or factual findings on the mixtures' usability or marketability is his counsel's deficient performance, specifically:  counsel's alleged failure to investigate the drug quantity issue, to research and discover relevant circuit law, to ask Armstrong whether the liquids were "usable" substances or toxic waste products or precursor materials, and to present any evidence about the nature and properties of the liquids.

Based on Griffith's allegations, the entire weight of the top layers of liquids in the containers (that is, the liquids that were weighed and counted against him) should not have been used in determining the weight of the "mixture[s] or substance[s]."  See Rolande-Gabriel, 938 F.2d at 1238; Segura-Baltazar, 448 F.3d at 1292–93.  But counsel allegedly did nothing to prevent that.  Griffith has alleged facts that, if true, show that counsel's performance was deficient.

## B.  Prejudice

Of course, Strickland requires more than just deficient performance on the part of a defendant's attorney.  To be entitled to an evidentiary hearing on his ineffective assistance of counsel claim, Griffith must also allege facts showing a reasonable probability that, but for his counsel's error, the result of the proceeding would have been different.  See Strickland, 466 U.S. at 694, 104 S. Ct. at 2068; Aron, 291 F.3d at 715 n.6.  Griffith contends that had counsel effectively argued that the liquids in this case were not a usable "mixture or substance," there is a

30

reasonable probability that he would have received a lower guidelines range and a lower sentence.

In Molina-Martinez v. United States, the Supreme Court addressed whether a district court's application of an incorrect guidelines range "affected [a] defendant's substantial rights." 578 U.S. __, 136 S. Ct. 1338, 1345 (2016). In that case the district court had applied a guidelines range of 77 to 96 months imprisonment and sentenced the defendant to the bottom of that range. Id. at 1344. The defendant raised the argument for the first time on appeal that the district court had miscalculated his guidelines range, which should have been 70 to 87 months. Id. Because he had failed to object to the miscalculation, review was for plain error only. Id. at 1343. The third prong of the plain error rule requires that the defendant "must show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." Id. (quotation marks omitted). That showing is the same one that a defendant must make to establish prejudice under Strickland. See Strickland, 466 U.S. at 694, 104 S. Ct. at 2068 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

In concluding that the defendant had shown a reasonable probability of a different result in that case, the Supreme Court in Molina-Martinez reasoned that: "In most cases a defendant who has shown that the district court mistakenly

31

deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome." 136 S. Ct. at 1346. It explained that the guidelines' "central role in sentencing means that an error related to the Guidelines can be particularly serious," and that in the "usual case," the "selected Guidelines range will affect the [defendant's] sentence." Id. at 1345–46; see id. at 1346 ("[T]he Guidelines are not only the starting point for most federal sentencing proceedings but also the lodestar."). Because the district court had selected a sentence of 77 months, which was the bottom of what it "believed to be the applicable range," and because the court "said nothing to suggest that it would have imposed a 77-month sentence regardless of the Guidelines range," the Supreme Court concluded that "there is at least a reasonable probability that the District Court would have imposed a different sentence had it known that 70 months was in fact the lowest sentence the [Sentencing] Commission deemed appropriate." Id. at 1347–48.

Griffith argues that based on the Molina-Martinez decision, if he can prove the facts alleged in his § 2255 motion, he has established that there is a reasonable probability that the district court may have imposed a lower sentence if defense counsel had successfully contended that the drug quantities attributed to Griffith, and the resulting guidelines range, were erroneously high. Instead, counsel agreed with the government that the guidelines range for the grouped counts was 188 to

32

235 months.  Like the court in <u>Molina-Martinez</u>, the court in this case sentenced Griffith to the low end of the guidelines range, 188 months, on the grouped counts (plus 60 months on the ungrouped Count 2, to be served consecutively).  And there is no indication in the record that the court would have sentenced Griffith the same if the guidelines range had been lower.  For those reasons, Griffith argues, there is a reasonable probability that the district court would have imposed a different sentence had it known that a lower guidelines range applied.  <u>See</u> <u>id.</u>

The government contends that <u>Molina-Martinez</u> has no bearing here because that case involved application of the plain error standard on direct review, while this case involves application of the <u>Strickland</u> prejudice standard on collateral review.  It argues that <u>Molina-Martinez</u> creates a presumption of prejudice for direct appeal and that this Court cannot apply a presumption of prejudice in a collateral proceeding.  <u>See</u> <u>United States v. Gordon</u>, 518 F.3d 1291, 1301 (11th Cir. 2008) ("Although we presume, in a direct appeal, when the court could have imposed a more lenient sentence, that the absence of inquiry about the right to allocute has prejudiced a defendant, Supreme Court precedents bar us from making that presumption in a collateral proceeding.") (citation omitted).  The government also argues that a presumption of error in a collateral proceeding "would be directly contrary" to the Supreme Court's decision in <u>United States v. Cronic</u>, 466 U.S. 648, 104 S. Ct. 2039 (1984).

The minor premise of the government's contention, which is that Molina-Martinez created a presumption of prejudice in direct appeal cases, is far from clear. The Court's opinion used the word "presume" or any of its derivatives only once and that was to say that "reviewing courts may presume that a sentence imposed within a properly calculated Guidelines range is reasonable." 136 S. Ct. at 1347 (citing Rita v. United States, 551 U.S. 338, 341, 127 S. Ct. 2456, 2459). Presuming that a sentence within a correct guidelines range is reasonable is not the same thing as presuming that an incorrect guidelines range affected the sentence.

In his concurring opinion in Molina-Martinez, Justice Alito emphasized that the Court was not presuming prejudice. He pointed out that: "We have previously warned against courts' determining whether an error is harmless through the use of mandatory presumptions and rigid rules rather than case-specific application of judgment, based upon examination of the record." Id. at 1350 (Alito, J., joined by Thomas, J., concurring) (quotation marks omitted). Instead of prejudice being presumed, it must be determined based on a "full-record assessment" that considers "a variety of factors." Id. (quotation marks omitted).

The Court's opinion in Molina-Martinez did predict that "[i]n most cases" the application of an incorrect, higher guidelines range will be sufficient to show a reasonable probability of a different result. Id. at 1346; id. at 1345 ("[T]he error can, and most often will, be sufficient to show a reasonable probability of a

34

different outcome absent the error."); id. at 1346 ("In the usual case, then, the systemic function of the selected Guidelines range will affect the sentence."); id. at 1347 ("Where, however, the record is silent as to what the district court might have done had it considered the correct Guidelines range, the court's reliance on an incorrect range in most instances will suffice to show an effect on the defendant's substantial rights.  Indeed, in the ordinary case a defendant will satisfy his burden to show prejudice by pointing to the application of an incorrect, higher Guidelines range and the sentence he received thereunder.  Absent unusual circumstances, he will not be required to show more.").

A prediction is not, however, a presumption.  That is why the Court in the Molina-Martinez opinion explicitly pointed out that "[t]here may be instances when, despite application of an erroneous Guidelines range, a reasonable probability of prejudice does not exist.  The sentencing process is particular to each defendant, of course, and a reviewing court must consider the facts and circumstances of the case before it."  Id. at 1346 (emphasis added).  The Molina-Martinez opinion recognizes that, depending on the facts of the case, the application of an incorrect, higher guidelines range may not be enough to establish a reasonable probability that the defendant would have received a different sentence had the district court applied the appropriate guidelines range.

35

Whether the prediction of how often the use of an erroneously high guidelines range will result in prejudice differs depending on whether the issue is raised in the context of plain error review on direct appeal or as part of an ineffective assistance of counsel claim in a § 2255 proceeding is one we need not decide in this case. If Griffith proves the factual allegations he has made, he will have shown that counsel's failure to render reasonably effective assistance not only resulted in an erroneously higher guidelines range but it also caused the sentencing court to apply an inapplicable statutory mandatory minimum for Count 1.[13] There is nothing in the record to indicate that the combined force of those two errors did not affect his sentence. To the contrary, the fact that the district court sentenced Griffith to the bottom of the guidelines range on the grouped counts, even though the government argued for a sentence above the guidelines range, is evidence of a reasonable probability of a different result. See id. at 1347–48; id. at 1350 (Alito, J., joined by Thomas, J., concurring). As a result, Griffith has alleged facts that, if

---

[13] The minimum amount of methamphetamine required for the jury to convict, as it did, under Count 1 is only a "detectable amount." Griffith has always admitted that he had manufactured a detectable amount of it, and the evidence proved it. By contrast, the mandatory minimum sentence required a finding by the jury that Griffith had manufactured 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, and Griffith has always disputed that he did manufacture or could have manufactured that amount. That is why, if the alleged facts are proven, there is a reasonable probability of a different result as to the quantity finding supporting the mandatory minimum sentence, but not for the guilty verdict.

36

true, show that his counsel's deficient performance prejudiced him.  See

Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.[14]

## IV.  CONCLUSION

The district court's judgment is **REVERSED** and the case is **REMANDED**

for an evidentiary hearing on the ineffective assistance of counsel claim involving

the failure to challenge the quantity of methamphetamine attributed to Griffith.

---

[14] Our holding is not inconsistent with this Court's recent Beeman decision, which recognized our longstanding precedent that a § 2255 petitioner bears the burden of proving he is entitled to habeas relief.  See Beeman v. United States, No. 16-16710, __ F.3d __, 2017 WL 4210419, at *5 (11th Cir. Sept. 22, 2017).  In that case the petitioner, who had been sentenced under the Armed Career Criminal Act, alleged that he was entitled to habeas relief in light of Johnson v. United States, 576 U.S. __, 135 S. Ct. 2551 (2015), which held that the ACCA's residual clause is unconstitutional.  Id. at *2.  We held that Beeman had failed to establish that he was entitled to relief because he could not prove that he had been sentenced under the residual clause.  Id. at *8.  Based on the record in that case he might have been, or he might not have been, and when we cannot tell the petitioner has failed to meet his burden in a § 2255 proceeding.  Id.

In this case, to establish a reasonable probability of a different result, Griffith must show that the district court relied on an incorrect, higher guidelines range, see Molina-Martinez, 136 S. Ct. at 1347, and that nothing else in the record indicates that he would have gotten the same sentence anyway.  He has alleged that.  Instead of being a draw, which would be the situation if we could not tell what guidelines range the court relied on in sentencing Griffith, we know for sure which range it used, and we know for sure which statutory mandatory minimum it applied.  Whether that range was too high and whether that mandatory minimum was inapplicable depends on historical facts that are subject to proof.  Having alleged material facts that are not contradicted by the record and that are subject to proof, Griffith is entitled to an opportunity to carry his burden of proving the existence of those facts.  In Beeman, by contrast, the petitioner could not prove whether the district court had relied on the unconstitutional residual clause of the ACCA.  No one knew.

37